UNITED STATES of America, Appellee,

v.

Ernest MENDEL and Albert Mendel & Son, Incorporated, Defendants-Appellants.

Cal. No. 1406, Docket 84–1098.

United States Court of Appeals, Second Circuit.

Argued June 26, 1984.

Decided Oct. 16, 1984.

Deborah A. Batts, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Barry A. Bohrer, Asst. U.S. Atty., New York City, on the brief), for appellee.

Robert G. Morvillo, New York City (Andrew Tureff, Obermaier, Morvillo & Abramowitz, P.C., New York City, on the brief), for defendants-appellants.

Before KEARSE and PIERCE, Circuit Judges, and MARKEY, Chief Judge.[*]

MARKEY, Chief Judge:

Appeal from judgments of the United States District Court for the Southern Dis-nation.

[*] Chief Judge Howard T. Markey, U.S. Court of Appeals for the Federal Circuit, sitting by desig-

trict of New York convicting Ernest Mendel (Mendel) and Albert Mendel & Son, Inc. (M & S), following a bench trial before Whitman Knapp, *Judge,* of making and causing to be made false representations and statements to the United States Department of Agriculture (USDA), in violation of Title 18, United States Code, §§ 1001 and 1002.[1] We vacate that part of the judgment convicting Mendel and order a new trial. We affirm that part of the judgment convicting M & S.

### BACKGROUND

M & S was engaged primarily in wholesale buying and selling of cattle and had its main farm in Patterson, New York. Mendel was vice-president and principal stockholder of the family owned and operated business.

The indictment, dated February 8, 1983, contained fifty-two counts. Counts one to forty-four charged false statements and representations that certain of M & S's cows were individually tested on specific dates in 1978 for brucellosis. Counts forty-five to fifty-two charged false representations that certain cows had been properly tested on specific dates in 1978 for tuberculosis.

Mendel and M & S ultimately stood convicted on twenty-three counts (four, five, eighteen through thirty-six, forty and fifty-one). The District Court: sentenced Mendel to concurrent terms of imprisonment of one year and one day on each of counts four, eighteen through twenty-five and forty; fined Mendel $50,000; suspended Mendel's sentence on counts five, twenty-six through thirty-six and fifty-one; placed

Mendel on probation for three years; and fined M & S $100,000.

The counts of the indictment spelled out and charged falsity in specific representations appearing on particular M & S records prepared and filed during 1978 and relating to USDA required tests. Blood extracted from each cow to be shipped is forwarded in labeled vials to a diagnostic laboratory (located in this case in Storrs, Connecticut). The laboratory tests the blood to determine whether the cow is diseased and reports on the results. As part of the paperwork in obtaining permission to ship the tested cows in interstate or foreign commerce, M & S filed reports of the tests here involved in Albany, New York.

The government alleged that the blood M & S submitted to the laboratory was not that of the cows sought to be shipped, and that the test results were therefore false.

Under a proper procedure, a veterinarian hired by M & S would draw the blood and place it in the vials. While the veterinarian drew blood, an M & S employee would read the cow's eartag identification number to another employee who would write it down, so that each cow's blood sample would have a number corresponding to that cow's eartag number. The ear tag numbers were entered on charts called New York State Department of Agriculture & Markets Test Records. The veterinarian was supposed to draw the blood, sign the charts, and deliver or mail the vials and charts to the diagnostic laboratory.

It is not here contested that on numerous occasions charts were presigned in blank,

---

1. 18 U.S.C. §§ 1001 and 1002 read:
   Statements or entries generally.
   Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

   June 25, 1948, c. 645, 62 Stat. 749.
   Possession of false papers to defraud United States.
   Whoever, knowingly and with intent to defraud the United States, or any agency thereof, possesses any false, altered, forged, or counterfeit writing or document for the purpose of enabling another to obtain from the United States, or from any agency, officer or agent thereof, any sum of money, shall be fined not more than $10,000 or imprisoned not more than five years, or both.
   June 25, 1948, c. 645, 62 Stat. 749.

eartag numbers were typed in after the veterinarian had left the farm, and blood was left at the farm for delivery by M & S to the laboratory. Those sloppy practices, though clearly suspect, are not themselves charged as crimes in the indictment. The crimes charged here that particular charts M & S made in 1978 and sent to Storrs, and those delivered in 1978 to Albany (the latter called United States Origin Health Certificates)[2] contained false assertions that the tested blood had been extracted from the certain cows listed in the indictment and that each listed cow had been properly tested. The gravamen of the crime (falsity of the statements made and used by M & S) being established, it would not be necessary to establish the source of blood samples accompanying those statements. Nonetheless, the government sought to prove that blood drawn from cows (if any) was discarded and blood drawn from disease-free bulls was substituted.

It is not contested that test records in evidence were filed by the Storrs laboratory with the New York Agriculture and Markets Department (NYAMD) in Albany, New York, that an employee of M & S hand delivered the Origin Health Certificates of Counts 4, 5, and 25–36 to USDA in Albany, and that USDA relied on NYAMD test records to complete Origin Health Certificates. Under a formal memorandum of understanding with NYAMD, USDA relies on information in records filed with NYAMD, and a false statement made to NYAMD would be in essence made to USDA.

Evidence was introduced of scientific tests of certain particular M & S blood samples the government obtained from the Storrs laboratory and forwarded to the National Veterinary Services Laboratories in Ames, Iowa. It was stipulated that those tests established that those samples came from no more than one or two animals and could not have come from the hundreds of cows listed on the M & S reports and set forth in the indictment.

According to Wilfred Lamb, a USDA compliance officer, blood was drawn from two bulls M & S sent for slaughter to Snider Brothers slaughterhouse. That blood was mailed to the USDA laboratory in Waltham, Massachusetts, which in turn mailed it to the Serology Laboratory at the University of California at Davis. Davis laboratory scientists tested that bulls' blood and concluded that it scientifically matched blood received from Ames and asserted by the government to have been the blood represented by M & S as having come from the cows listed in the indictment.

Having stipulated the results and validity of the government's scientific tests, M & S contends that the chain of custody of the involved blood samples was insufficiently established and that the government's proof that the matching blood had come from M & S's bulls was insufficient.

A strongly contested issue at trial was whether Mendel knew of, authorized, or was responsible for blood substitution and consequent false statements. The government relied on testimony of two witnesses—Roger Roe (Roe), an ex-employee of M & S, and Dr. Charles Frumerie (Frumerie), a veterinarian hired by M & S.

Roe testified that on several occasions in 1977 and 1978 he participated in drawing blood and that on some of those occasions Mendel was a participant. M & S contends that Roe's testimony was contradicted by that of Dr. Kay, by his own prior deposition, and by defense witness Evi Scholz.

Frumerie testified that on his return from vacation on August 21, 1978, Mendel told him that in Frumerie's absence he had drawn blood from cows and had forwarded 148 samples to the laboratory. The government asserted that its scientific evidence established that that particular blood matched the blood of the donor bulls. The

2. The USDA uses United States Origin Health Certificates for cows exported to foreign countries. The Certificates accompany the exported cows and list the eartag number, the farm from which it originated, the age, sex, and breed of the cow and the disease test results.

defense contested Frumerie's credibility during the evidentiary stages of the trial.

Though the trial court expressly found that Mendel had not been tied to any counts and that there was no evidence directly establishing that Mendel had specific knowledge relating to any count in the indictment, it nonetheless found him guilty because of an "intimate concern with the process of putting in these test results and filing them".

Statements confusing because conflicting were made by the trial court during and after the trial. Those statements form a foundation for the appeal and reflect an abuse of discretion in the denial of Mendel's motion for mistrial.

### Issues

Appellants raise these issues:

(1) Whether the trial of Mendel was fair.

(2) Whether venue was proper.

(3) Whether blood samples were properly authenticated and scientific tests were properly admitted.

(4) Whether the sentences were lawful.[3]

### Opinion

#### A. *Mendel*

#### (1) *Fair Trial*

The constitutional standard is fairness, not perfection. It is nonetheless, and rightfully, a high standard, for the court in a criminal case deals with the life and liberty of an individual. *See generally Fay v. Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); *United States v. Wilkins,* 348

F.2d 844, 867 (2d Cir.1965), *cert. denied,* 383 U.S. 913, 86 S.Ct. 896, 15 L.Ed.2d 667 (1966). Thus it matters not whether Mendel may have actually known of some unindicted practices. Absent proof at trial, the law is blind. Our laws require that a presumptively innocent citizen be proven guilty by his government in a trial on specific charges.

Nor will unsupported probability or assumption alone meet the standard. Fairness of trial requires that the judicial process be carefully conducted in accord with established roles and rules. That did not, unfortunately, happen here. Whether one may assume that a vice-president of a corporation found guilty of a criminal practice must have been aware of, participated in, or knowingly and willfully directed that practice is not the question. The constitutional fair trial standard requires proof, not mere assumption. That standard further requires that if there be error in conduct of trial, that error must not be such as to have prejudiced the accused's full opportunity to present a defense.

Mendel contends that he was deprived of a fair trial when the trial court first indicated and then at end of trial reversed its indication that it would disregard Frumerie's testimony about Mendel's August 1978 conversation with him, because the first part of that sequence of judicial comment misled counsel into failing to pursue additional evidence to further impeach Frumerie's credibility and rebut his testimony, and precluded him and Mendel from properly assessing the need for Mendel to testify. The government says those assertions overstate the significance of Frumerie's

---

**3.** In view of our disposition of the fair trial issue, it is not necessary to discuss a remand for re-sentencing in light of the bases for Mendel's sentence set forth by the trial court (concern for what the public might think of the sentence; recognition that other herd owners could logically attribute herd losses to Mendel; and Mendel's refusal to admit guilt. *See* note *infra.* We deem well within the district court's discretion the fine imposed on M & S following conviction on 23 counts of the indictment.

Nor is it necessary to discuss the relationship of the charges in the indictment to the basis on which Mendel was convicted. Despite the trial court's specific finding that no evidence tied Mendel to the false statements set forth in the indictment or showed that he had specific knowledge of any of those false statements, and though counsel at trial objected to testimony on events outside the time of the indictment, Mendel raised no claim on appeal that he had been convicted of conduct on which he had not been indicted.

testimony and the potential for prejudice present in the district court's statement.

We confront a confused and confusing record respecting the trial court's evaluation of and reliance on Frumerie's testimony.

In the midst of trial, in effectively quashing a defense subpoena for a Department of Education witness to impeach Frumerie's credibility, the trial court stated:

I am prepared to rule here and now that I will not accept that witness, Dr. Frumerie's testimony, for anything except what is incontrovertibly established. I will not accept his testimony as to what the defendant [Mendel] said to him or anyone else said to him, because I don't find his testimony reliable. I don't say he is a liar, but I say he is completely incapable of remembering these things.

When the prosecutor promptly asked whether she could seek a change in that ruling until trial's end, the court said:

You can try, but I don't think you will get very far.

.  .  .  .  .

The rest of his [Frumerie's] testimony is completely consistent with that, they asked him a question and he felt he had to give an answer.

... I rely on the uncontroverted fact that he handed in presigned forms, but what was said to him as to the presigned forms, I won't rely on.

The court later reaffirmed its refusal to credit Frumerie:

THE COURT: Before the next witness is called, I would like to make an observation for the record in connection with Dr. Frumerie.

I said that I would not accept his credibility on the subject of certain details that we have discussed, and I don't want to give the impression that I think he is a dishonorable man, because I don't have any reason to believe that he is a dishonorable man. It is just that I think he was under such emotional pressure in this case that I don't think his testimony is reliable on those details.

During summations after close of testimony, however, and after saying its preliminary feeling was to acquit Mendel and convict M & S, and without warning, the trial court said this about Frumerie's testimony:

I didn't say I would disregard it. I said I found him to be a witness who could not be relied upon as to details.

I will say, however, that there is one exception to that. I found [Frumerie's] testimony very convincing as to the fact that he had come back from vacation and been told by Mr. Mendel that these forms had been filed.

Defense counsel immediately and vigorously protested, citing the court's earlier ruling, explaining its prejudicial effects, and indicating a need for a mistrial motion if the court credited Frumerie's testimony. Making no finding or statement respecting the claim of prejudice at that point, and taking no "steps so that the parties are not prejudiced by reliance on the prior ruling", *Swietlowich v. County of Bucks*, 610 F.2d 1157, 1164 (3rd Cir.1979), the trial court responded to counsel's protest and claim of prejudice with a single word, "Proceed".

Having found Mendel and M & S guilty, the trial court, in explanation, again referred to Frumerie's testimony about his conversation with Mendel:

I could say that I don't need that conversation to establish the defendant [Mendel's] intimate concern with the entire operation, but I don't think that would be altogether fair. Although I am confident that I would have come to the same conclusion without hearing that testimony, I cannot be sure of that.

And, in rendering its findings, the court again referred to Frumerie's testimony about the conversation with Mendel:

I was impressed with the fact that he had that conversation upon his return from vacation. As I said, I was not impressed with his explanation of what it meant to him. I was highly unimpressed with that, but it came across quite clearly that he had the conversation.

■ It is not too much to say that counsel was seduced by the court's first ruling into forgoing submission of evidence that the blood samples (those Frumerie said Mendel admitted drawing and sending in during Frumerie's vacation) had actually been drawn by Frumerie before his vacation; dropping open subpoenas for witnesses; and a decision of Mendel not to testify. Once assured that Frumerie's testimony would be ignored, counsel told the trial court he tried the entirety of the remaining trial portion on that premise.

■ If a trial court elects to announce a credibility determination in midst of trial, counsel cannot be faulted for reliance on that announcement in formulating ensuing trial strategy. If that announcement is to be nullified, avoidance of prejudice would appear to require that counsel be given warning and the opportunity to conduct a defense in light of the new trial environment thus created. *Swietlowich, supra.* It is difficult to envisage a more certain basis for a risk of prejudice than a trial court's last-minute 180-degree turn in its announced treatment of testimony relied on to support a guilty finding.

In responding to counsel's claim that prejudice in forgoing the calling of witnesses to impeach and rebut Frumerie's testimony was causing him a big problem, the trial court said:

> It is not causing any problem at all because all the inconsistent statements in the world that you might have addressed from all the files that there were found would have done nothing to add to my skepticism of Dr. Frumerie's ability to remember details, nor would that have affected my impression that the testimony made on me that he vividly remembered that confrontation.

It was, however, precisely the memory of that "confrontation" (conversation) which counsel was assertedly prepared to destroy through witnesses who would establish that the 148 samples Frumerie remembered Mendel saying he had drawn during Frumerie's vacation had in fact been drawn weeks earlier by Frumerie himself.

The government asserts that no prejudice resulted here because Frumerie's testimony tied Mendel only into non-criminal blood-drawing and was not therefore "damaging". The government appears to have forgotten that Frumerie said Mendel told him about Mendel's sending 148 samples to Storrs and that those very samples were proven at trial to have been blood drawn from bulls. It also ignores the trial court's own statements that it found "convincing" Frumerie's testimony that he had "been told by Mr. Mendel that these forms had been filed," [4] that it would not be "fair" to say the court did not "need that conversation" to establish Mendel's "intimate concern with the entire operation", and that it could not be "sure" of its conclusion on Mendel's "intimate concern" (the sole stated basis for Mendel's conviction) without crediting Frumerie's testimony about that conversation.

The government says that Roe's testimony was sufficient to tie Mendel to blood substitution and that Mendel's decision not to testify in light of Roe's testimony indicates that he was not prejudiced in being led to forego testifying by the court's ruling of non-reliance on Frumerie's. The argument is without merit.

A decision on whether to testify, when the time comes, need not be a once-and-always event. In the course of a trial, that decision may be many times made. Each time it will presumably be made in light of all the testimony then of record. As above indicated, Roe's testimony had been countered with substantial cross-examination and with Scholz' testimony. The trial court made no announcement during trial on

---

4. It but adds to the confusion to note that Frumerie said nothing at all about Mendel filing forms, except insofar as it can be assumed that forms accompanied the 148 samples Mendel was alleged to have said he had sent in. Moreover, crediting Frumerie's testimony as stated by the trial court conflicts directly with the trial court's finding that Mendel had not been tied to or had specific knowledge of any count of the indictment, the 148 samples being the basis for some of those counts.

whether it gave any credence to Roe's testimony. Unlike Frumerie, as the district court stated, Roe had not tied Mendel to any particular blood sample or group of samples. Indeed, Roe had said only that he assisted Mendel in blood drawing and that he could not remember the year in which he did so. Hence Roe, as the trial court recognized, did not tie Mendel to any of the false statements set forth in the indictment. At that point, with the indictment in mind, counsel might well have considered it safe to decide that Mendel would not take the stand. Indeed, though the court ultimately credited Roe's testimony as establishing Mendel's knowledge of and participation in a general practice of drawing blood from donor animals, though "not necessarily during the time of the indictment", the court also indicated that it had previously been persuaded that the defense had "cast doubt on [Roe's] testimony". True, it cannot now be known whether Mendel would have testified had he been told that Frumerie's story would be "needed" for conviction; yet, it is not unreasonable to require that the data on which the ultimate decision not to testify is made be free of misleading court pronouncements on credibility. The reasonableness of such a requirement is illustrated here, where the court at trial's end specifically cited its felt necessity for reliance on Frumerie's testimony, notwithstanding its concurrent statement about reliance on that of Roe.

The government quotes the trial court as saying that it relied on "testimony of other witnesses" that established "Mendel's intimate concern with the process of putting in these test results and filing them, and that excludes to a moral certainty the possibility that he might have been ignorant as to what was going on". Neither the trial court nor the government has favored us with the names of such "other witnesses". The quotation also ignores the trial court's

immediately following statement, *supra*, that it would not be "fair" to say it did not "need" Frumerie's testimony about his conversation with Mendel and that it could not, without that testimony, be "sure" of its conclusion about Mendel's "intimate concern with the entire operation".[5]

The trial court, having found a failure of proof that Mendel was personally involved in or aware of the false statements alleged in the indictment, convicted Mendel on the ground he was "at some point aware of" and "participated in" taking blood from donor animals (presumably for purposes of substitution to support false statements). The government emphasizes this statement of the court:

> The truck driver's [Roe's] testimony does clearly indicate, however, that at some point, not necessarily during the time of the indictment, Mr. Mendel was aware of the practice of taking blood from donor animals and that he participated in it. That's what Mr. Roe's testimony establishes. I don't find any basis for concluding that he was doing it out of spite. On the contrary, I was impressed with the nature of his testimony.

The government cites the foregoing statement as indicating that Frumerie's testimony and the court's substitution of rulings on it could not have caused prejudice to Mendel's defense. The government's difficulty, as above indicated, lies in the trial court's repeated statement that it *did* need Frumerie's testimony to be "fair" in convicting Mendel.

There is yet another difficulty in the government's argument that it was Roe's testimony that tied Mendel to the "taking of blood from donor animals." Roe said nothing at all about the animals being "donors," and knew nothing of what was done with the blood he said he saw being drawn. His testimony that many vials were filled from one animal carries a strong implica-

---

**5.** Mendel cites the trial court's statements as illustrative of a "classic case of reasonable doubt". The government says those statements meant only that the trial court would not have been "firmly convinced" without the conversation, at least not "with absolute certainty", citing

Pattern Criminal Jury Instructions (Federal Judicial Center 1982). In view of our disposition, we need assay no such effort to search the mind of the trial court as would be required to resolve those conflicting contentions.

tion, but, as the trial court recognized, Roe could not recall even in what year the blood drawing he described occurred. As the trial court further recognized, Roe did *not* say Mendel participated in drawing blood from bulls. As the court said about Roe's testimony during a Rule 29 argument:

> I found very little reason not to credit his testimony and one of the strongest points of it was his refusal to say it was a bull which obviously he knew everybody wanted him to say that.

In all events, Roe's testimony cannot be described as so damaging, though counsel at one point expressed "concern" about it, as to warrant the view that Mendel's decision not to testify, made at conclusion of all the government's evidence, could not have been prejudiced by his court-assured expectation that Frumerie's testimony about the conversation would be ignored.

The trial court recognized the central nature of the question of prejudice in denying the motion for mistrial, saying:

> Now we come to prejudice to the defendant, which Mr. Morvillo urged a motion for a mistrial. In my discretion I deny that motion because I don't think my comments concerning Dr. Frumerie prejudiced the defendant for the various reasons I stated earlier. However, there is a ruling which is available to him.

In thus denying the motion for mistrial, the trial court appears to have lost sight of the phenomenon in which premature, non-required pronouncements of a court's credibility evaluations can conceivably cause counsel to stumble. Doubtless the court's intent here was to be helpful and to move the trial along, but such pronouncements by the one who must eventually decide can send important "signals" to one seeking to persuade. When such pronouncements, as here, are contradictory and no steps are taken to avoid prejudice, they can result in denial of a fair trial. The risk they represent is therefore not to be encouraged. True, such pronouncements may not in every case have had the prejudicial effect sure to be attributed to them by defendants on appeal. When that is true, a reversal on

the ground that they did could be nothing more than a reward for adroit gamesmanship. *See United States v. Van Meerbeke,* 548 F.2d 415, 418 (2d Cir.1976), *cert. denied,* 430 U.S. 974, 97 S.Ct. 1663, 52 L.Ed.2d 368 (1977). In the present case, however, the conclusion is compelled that the pronouncements of the trial court so prejudiced Mendel's defense as to have constituted denial of the fair trial mandated by the Constitution.

It cannot be said that a criminal trial was fair when the judge in mid-trial announced that certain testimony will not be credited and then without warning based a conviction in major part on that very testimony. Because that happened here, the motion for declaration of a mistrial should have been granted and a new trial of Mendel must be ordered.

### B. *M & S*

That Mendel was denied a fair trial does not in this case absolve the corporate defendant M & S. *See United States v. American Stevedores, Inc.,* 310 F.2d 47, 48 (2d Cir.1962), *cert. denied,* 371 U.S. 969, 83 S.Ct. 552, 9 L.Ed.2d 539 (1963). It was admitted that M & S, acting as it must through its employees, made and used the reports and statements on which the indictment was brought, and that it delivered them to Albany. Its defense rested entirely in an attack on venue and the evidence. Though Mendel's defense was prejudiced by the court's ruling reversal, the same cannot be said of M & S's defense. Though Mendel's decision-making on whether to testify in his own behalf was prejudiced, M & S was not thereby deprived of its key witness, *cf. Matter of Kitchen,* 706 F.2d 1266 (2d Cir.1983), for Mendel's testimony countering that of Frumerie could not have countered the falsity of the M & S reports it admittedly filed in Albany.

### (2) *On Remand*

The district court's findings in respect of Mendel's guilt contained certain statements indicating that Mendel's new trial should be held before a different judge. In find-

ing Mendel guilty of making false statements, the court stated that although it did not find any direct evidence of Mendel's specific knowledge of the acts charged in the indictment, it was "inconceivable" to the court that the challenged practices could have gone on without his specific authorization and direction. (Tr. 1221; *id.* at 1222 ("As I said, *it is inconceivable* it could go on without his authorization and direction ...." (emphasis added)) The court found that the government's evidence "*excludes to a moral certainty the possibility* that [Mendel] may have been ignorant as to what was going on." (Tr. 1226; emphasis added.))

In imposing sentence, the court urged defense counsel to offer some explanation for Mendel's acts. When counsel stated that he could not do so because Mendel's position was that he had not committed the offenses charged, the court stated, *inter alia,* as follows:

> THE COURT: I can't help it if you insist that he's not guilty when its perfectly obvious to me that although there are technical reasons you have no [sic] reversal, *there's no conceivable doubt that he did what the indictment has said that he did.*
>
> MR. MORVILLO: Your Honor has found that, and I can't dispute that.
>
> THE COURT: There may be technical defenses and more power to you if you establish them. But I have to deal with the fact of guilt.

(*Id.* at 19; emphasis added.)

> THE COURT: *I know as a fact that he deliberately did acts* which would

lead anybody who lost their herd to think it was his responsibility.

(*Id.* at 20; emphasis added.[6])

◼ We do not imply any personal criticism of the trial judge. However, in light of the "firmness of the judge's earlier-expressed views," *United States v. Robin,* 553 F.2d 8, 10 (2d Cir.1977) (en banc), as to the inconceivability of Mendel's innocence, we think it appropriate to remand the charges against Mendel for retrial before another judge. *See id.* at 9–11; *United States v. Stein,* 544 F.2d 96 (2d Cir.1976).

### (3) *Venue*

M & S's claim that venue lay only in the Northern District of New York, because the involved statements, reports, and charts were filed in Albany, is entirely without merit.

◼ Venue in a criminal case is determined by the locus of the offense. *United States v. Chestnut,* 533 F.2d 40, 47 (2d Cir.), *cert. denied,* 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 93 (1976). The locus is to be "determined from the nature of the crime alleged and the location of the act or acts constituting it". *United States v. Anderson,* 328 U.S. 699, 703, 66 S.Ct. 1213, 1216, 90 L.Ed. 1529 (1946). And, in making that determination "[o]ne helpful technique" is "to study the key verbs which define the criminal offense in the statute". *United States v. Chestnut, supra,* 533 F.2d at 46–47; *United States v. Slutsky,* 487 F.2d 832, 839 (2d Cir.1973), *cert. denied,* 416 U.S. 937, 94 S.Ct. 1937, 40 L.Ed.2d 287 (1974).

---

**6.** With respect to persons who thought Mendel responsible for the loss of their cattle through brucellosis the court stated, *inter alia,* as follows at sentencing:

> THE COURT ... I have letters from people who are convinced that he is responsible for destroying their herds.
>
> Now, I have ruled that I am assuming that he's not. But he has deliberately taken conduct which would lead anybody who loses their herd to assume that he's responsible. How could anybody who lost a herd, hearing what he'd done, not assume that he's responsible for the loss? And he did that deliberate-

ly. So he is deliberating [*sic*] responsible for the situation that if I were to suspend sentence upon him, many people would think I was suspending sentence upon a person who destroyed that herd. I'm not responsible for that situation. Mr. Morvillo isn't responsible for that situation, but Mr. Mendel is. So that is the framework in which I must approach this sentence.

(*Id.* at 14). If this reflected a concern of the court for the possibility of criticism of a lenient sentence, we would think that concern an inappropriate consideration in sentencing.

The key words in the statute here involved are those that proscribe the making or using of any false writing or document knowing it to contain false statements. 18 U.S.C. § 1001. M & S caused veterinarians Kay and Frumerie to pre-sign the involved Test Records and Health Certificates at the company farm in Patterson, New York, and to leave the forms and blood samples there, and it caused the bookkeeper to prepare the involved false typewritten Test Records and Health Certificates at the farm from information supplied by company employees—all within the Southern District of New York. Thus, the key verb form, "makes" indicates that venue lay properly in that district.

Under 18 U.S.C. § 3237(a),[7] an offense begun in one district and completed in another, or committed in more than one district, may be prosecuted in any district in which such offense was "begun, continued or completed". Venue under 18 U.S.C. § 1001 lies where a false statement is prepared and signed, though it may have been filed elsewhere. *United States v. Candella,* 487 F.2d 1223, 1227–28 (2d Cir.1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1563, 39 L.Ed.2d 872 (1974) (violation of 18 U.S.C. § 1001; venue proper where documents prepared and where filed). *DeRosier v. United States,* 218 F.2d 420, 423 (5th Cir.), *cert. denied,* 349 U.S. 921, 75 S.Ct. 660, 99 L.Ed. 1253 (1955) (Section 1001 offense indictable at place of its beginning or of its completion). In light of those authorities, M & S's venue argument is completely without foundation.

M & S distorts the nature of the offense in a vain effort to bring this case within the ambit of cases exemplified by *Travis v. United States,* 364 U.S. 631, 81 S.Ct. 358, 5 L.Ed.2d 340 (1961), calling this a "false filing case" and saying the conviction here was based on the act of filing false documents in the Northern District of New York. The reliance on *Travis* and its progeny is misplaced. In *Travis,* the defendant was charged under § 9(h) of the National Labor Relations Act, as amended by the Taft-Hartley Act, 61 Stat. 136, 146, and further amended by the Act of Oct. 22, 1951 § 1(a) 65 Stat. 601, 602 (later repealed by § 201 of the Labor Management Reporting and Disclosure Act of 1959, 73 Stat. 519, 525), and venue was held proper only where the false statement was filed because "the locus of the offense ha[d] been carefully specified; and only the single act of having a false statement at a specified place [was] penalized." 364 U.S. at 637, 81 S.Ct. at 362. As this court has observed, "the decision [in *Travis* ] surely was meant to be confined to the facts on the unusual statute involved." *United States v. Slutsky, supra,* 487 F.2d at 839. *Travis* merely limits the general venue statute in accord with Congress' specific mandate. *See United States v. Herberman,* 583 F.2d 222, 227 (5th Cir.1978). In the present case, no such congressional mandate exists, and the involved statute, 18 U.S.C. § 1001, says nothing whatever about "filing" or place of filing. The general venue statute is therefore applicable.

■ Because § 1001 proscribes making or using any false documents, and because the false documents in this case were made in the Southern District of New York, venue there was proper. *United States v. Slutsky, supra; United States v. Candella, supra.*

### (4) *Blood Samples/Scientific Tests*

M & S argues that no competent evidence established the authenticity of the blood tested at Davis or that sent by USDA to Ames and Davis. They assert error in the admission of documents establishing the chain of custody, arguing that GX–223

---

**7.** (a) Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

Any offense involving the use of the mails, or transportation in interstate or foreign commerce, is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district from, through, or into which such commerce or mail matter moves.

(a document establishing the link between the Mendel bulls and the blood tested at Davis) was "founded upon information contained on GX 224" (a report prepared by Snider Brothers slaughterhouse), and that because GX 224 was inadmissible as a business record pursuant to Fed.R.Evid. 803(6), GX 223 was itself inadmissible.

In September, 1978, M & S shipped many animals, including two bulls (Mendel Eartag numbers 65912 and 65913), to Snider Brothers. As part of the joint brucellosis eradication program, Snider Brothers was required to submit to USDA individual plastic bags containing blood samples and the identification tags from each animal slaughtered. Snider employees collect the blood samples and identification tags and mail them to the USDA, along with USDA forms the employees are required to fill out. One such USDA form, a Report of Back Tags Applied (GX 224) shows that on September 15, 1978, Snider employees affixed back tag numbers 6731 and 6732 to two of the animals received from Mendel.

Paul Kelly (Kelly), a USDA laboratory technician, received from Snider Brothers the blood samples and identification tags that Snider had obtained from all of the slaughtered Mendel animals. On September 21, 1978, Kelly prepared a Market Cattle Testing Program document (GX 223) on which he recorded that USDA had received from Snider Brothers two blood samples drawn from two Mendel bulls—each in a plastic bag; one accompanied by Mendel eartag number 65912 and Snider back tag number 6732; the other accompanied by Mendel eartag number 65913 and Snider back tag number 6731.

■■■ Thus GX 223 was not "founded upon information contained in GX 224", but was independently admissible as a record of regularly conducted activity, Kelly's testimony having established that GX 223 was "made at or near the time by, or from information transmitted by, a person with knowledge", that it was "kept in the course of a regularly conducted business activity, and [that] it was the regular practice of

[USDA] to make" the record. Fed.R.Evid. 803(6).

The Report of Backtags Applied (GX 224) was likewise admissible as a business record pursuant to Rule 803(6). Business records are admissible if witnesses testify that the records are integrated into an office's records and relied upon in its day-to-day operations. *United States v. Ullrich*, 580 F.2d 765, 771–72 (5th Cir.1978), *reh'g denied*, 589 F.2d 1114 (5th Cir.1979). By law, Snider Brothers was required to complete GX 224 and to submit it to USDA, which relies on its accuracy in enforcing the brucellosis eradication program. As occurred in *Matter of Ollag Construction Equipment Corp.*, 665 F.2d 43, 46 (2d Cir. 1981), testimony here established "that [GX 224 was on USDA's] own form, [was] completed at its request, and was the type regularly used by the [USDA] in making decisions ... [GX 224] therefore satisfied the primary requirements of a business records exception to the hearsay rule".

M & S says that no Snider Brothers employee laid an evidentiary foundation for admission of GX 224. Although an employee of the preparing business normally lays the foundation required by Rule 803(6), no such employee need testify when circumstances otherwise demonstrate trustworthiness. *United States v. Flom*, 558 F.2d 1179, 1182 (5th Cir.1977). Here, the circumstances manifestly demonstrate trustworthiness. M & S's own records corroborate the entries on the document. Accordingly, the District Court did not abuse its broad discretion in admitting GX 224. *United States v. Flom, supra.*

■■■ Contrary to M & S's argument, the record demonstrates that the government satisfactorily authenticated the blood sent to Ames and Davis by conclusively establishing a chain of custody that began with M & S and ended with the laboratories in Ames and Davis.

Establishing a chain of custody is one form of proof sufficient to support a finding that the matter in question is what its proponent claims. Fed.R.Evid. 901(a). *See United States v. Howard-Arias*, 679 F.2d

363, 366 (4th Cir.), *cert. denied,* 459 U.S. 874, 103 S.Ct. 165, 74 L.Ed.2d 136 (1982). Proof of the connection of an exhibit to the defendants may be made by circumstantial evidence. *United States v. Kubiak,* 704 F.2d 1545, 1552 (11th Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 163, 78 L.Ed.2d 149 (1983). And the prosecution need only prove a rational basis from which to conclude that the exhibit did, in fact, belong to the appellants. *United States v. Natale,* 526 F.2d 1160, 1173 (2d Cir.1975), *cert. denied,* 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976). The ultimate question is whether the authentication testimony is sufficiently complete so as to convince the court of the improbability that the original item had been exchanged with another or otherwise tampered with. *United States v. Howard-Arias, supra,* 679 F.2d at 366.

Here, there was abundant evidence—direct and circumstantial—that the blood samples transmitted to Ames and Davis and set forth in the indictment were those that had been submitted by M & S. It is undisputed that M & S prepared Test Records GX 1–3 and 6–8. Those Test Records listed the accompanying blood samples that had been submitted to the Connecticut laboratory. GX 1 listed 148 samples, GX 2 listed 197, and GX 3 listed 59—all of which Connecticut laboratory technician Amelia Hicking (Hicking) tested in the final days of July 1978. Hicking also recorded the test results on the corresponding Records.

On August 1, 1978, USDA Compliance Officer William P. Fleming (Fleming) took custody of 148, 197, and 59 blood samples and their corresponding Tests Records. On August 2, Fleming shipped those samples and Test Records to the USDA laboratory in Ames, where tests revealed that there was less than a one-in-a-billion chance that those samples came from hundreds of different animals, as M & S had represented (GX 200B, ¶¶ 43–46; GX 102). Other samples were prepared, received, and delivered to Davis in a similar fashion (GX 217).

The government proved a rational basis for a conclusion that the laboratories in Ames and Davis received the blood samples and that the blood samples originated with M & S. *United States v. Natale, supra,* 526 F.2d at 1173. That the USDA obtained 148, 197, and 59 blood samples, and accompanying M & S Test Records, from the Connecticut laboratory soon after M & S had delivered 148, 197, and 59 such samples and records to that laboratory made it most "improbable that the original item had been exchanged with another." *United States v. Howard-Arias, supra,* 679 F.2d at 366.

Though it was not necessary to establish the actual source of the submitted samples, proof that they could not have come from the listed cows being sufficient to establish the falsity of M & S's forms, the scientific evidence that blood samples for cows listed on GX 6, GX 7, and GX 8 actually came from two bulls that were at the Mendel & Son farm in the summer of 1978 went far to establish "that the evidence [was] what it purport[ed] to be and had not been altered in any material aspect." *United States v. Jackson,* 649 F.2d 967 (3d Cir.), *cert. denied,* 454 U.S. 1034, 102 S.Ct. 574, 70 L.Ed.2d 479 (1981).

Accordingly, the District Court did not abuse its broad discretion in admitting the reports of blood samples, (GX 223, GX 224), *United States v. Lavin,* 480 F.2d 657, 662 (2d Cir.1973), and M & S's attack on the evidence is without support in the record.

CONCLUSION

The judgment of conviction of Mendel is vacated and a new trial before a different judge is ordered. The judgment of conviction of M & S is affirmed.

VACATED IN PART AND AFFIRMED IN PART.