UNITED STATES of America
v.
Calvin CLARK, Appellant.
No. 17841.

United States Court of Appeals,
Third Circuit.

Argued Nov. 20, 1969.

Decided April 30, 1970.

**828**

James P. McKenna, Jr., Dickie, Mc-Camey & Chilcote, Pittsburgh, Pa. (Herbert Bennett Conner, Pittsburgh, Pa., on the brief), for appellant.

John H. Bingler, Jr., Asst. U. S. Atty., Pittsburgh, Pa. (Richard L. Thornburgh, U. S. Atty., Pittsburgh, Pa., on the brief), for appellee.

Before HASTIE, Chief Judge, and VAN DUSEN and ADAMS, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

Defendant was indicted, tried, and convicted by a jury on both counts of a two-count indictment which charged that he (1) unlawfully, wilfully, and knowingly did receive, conceal, and facilitate the transportation and concealment of narcotic drugs after those drugs had been illegally imported into the United States, knowing that the drugs had been illegally imported, in violation of 21 U.S.C. § 174; and (2) unlawfully, wilfully, and knowingly did purchase narcotic drugs other than in or from the original stamped package containing those drugs in violation of 26 U.S.C. § 4704(a). At trial, the Government introduced evidence to show that the narcotic drug involved was heroin and the jury returned a verdict of guilty on both counts. This appeal, from an order of judgment and commitment entered on January 16, 1969, which assessed separate fines totaling $5,000. and concurrent prison sentences of ten years, asserts constitutional infirmities in both of the statutes involved, as well as certain procedural errors at the trial.

### First Count (21 U.S.C. § 174[1])

■ The defendant first contends that he was denied due process of law by the application to him of the presumption contained in the second paragraph of this statute, providing that inferences of both illegal importation and the possessor's knowledge of same could be drawn from mere possession. He relies on that portion of the Supreme Court's opinion in Leary v. United States, 395 U.S. 6, 29, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), which invalidated a companion provision (21 U.S.C. § 176a) allowing a similar inference as to marijuana. The answer to this claim is that the Supreme Court has recently considered and rejected it in Turner v. United States, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970). There the Court ruled that, with respect to heroin, the presumption of illegal importation, "[w]hether judged by the more likely than not standard applied in Leary v. United States, *supra*, or by the more exacting reasonable-doubt standard normally applicable in criminal cases," *Id.* at 416, 90 S.Ct. at 652, was valid since the facts available indicated that all heroin in this country has been illegally imported. With regard to the presumption of knowledge, the Court stated that " 'Common sense,' Leary v. United

---

1. 21 U.S.C. § 174 provides:

"Whoever fraudulently or knowingly imports or brings any narcotic drug into the United States or any territory under its control or jurisdiction, contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of any such narcotic drug after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, or conspires to commit any of such acts in violation of the laws of the United States, shall be imprisoned * * *.

"Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury. * * * "

States, *supra*, at 46 [89 S.Ct. at 1553], tells us that those who traffic in heroin will inevitably become aware that the produce they deal in is smuggled" (396 U.S. at 417, 90 S.Ct. at 653) and ruled that this aspect of the statute was also not proscribed by due process requirements. Defendant's contention must, therefore, be rejected.

*Second Count (26 U.S.C. § 4704(a)[2])*

Clark argues that, having asserted his Fifth Amendment privilege against self-incrimination, he could not be punished for acquiring narcotic drugs without having paid the 1% per ounce regulatory excise tax under the rulings of the Supreme Court in Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); Grosso v. United States, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968); Haynes v. United States, 390 U.S. 85, 88 S.Ct. 722, 19 L. Ed.2d 923 (1968); and *Leary, supra*. This follows, he claims, since payment of the tax pursuant to the Harrison Narcotics Act[3] would have posed a threat of prosecution under various Federal and State laws. He therefore contends that his prosecution for purchasing unstamped narcotics cannot stand.

In evaluating this assertion, it is noted that, while the Court in the above-mentioned *Turner* case also considered and affirmed the constitutionality of this section, it did so with regard to that provision of § 4704(a) which provides that proof of possession shall be *prima facie* evidence of a violation, and it did not discuss any self-incrimination problem the section might pose.[4] The scheme of the Harrison Narcotics Act was succinctly described in another recent Supreme Court narcotics decision, Minor v. United States, 396 U.S. 87, 90 S.Ct.

284, 24 L.Ed.2d 283 (1969). There the Court said:

"The Harrison Narcotics Act, 26 U.S.C. § 4701 et seq., applies to various drugs, including heroin. Dealers must register and pay an occupational tax, 26 U.S.C. §§ 4721–4722; producers or importers who sell must purchase stamps and affix them to the package, 26 U.S.C. §§ 4701, 4703, 4771(a) (1); and it is illegal to purchase or sell except from the original stamped package, 26 U.S.C. § 4704(a). As in the case of the Marihuana Tax Act, all transfers, with exceptions not relevant here, must be made pursuant to a written order form issued by the Government. 26 U.S.C. § 4705(a). Only dealers who are in compliance with state law may register, and only registered dealers may secure order forms. 26 U.S.C. §§ 4705(f), (g); see 26 U.S.C. § 4721; 26 CFR § 151.-24. Order forms are issued in triplicate to proper applicants and are stamped only with the name of the prospective purchaser. 26 U.S.C. § 4705(f); 26 CFR § 151.161. When a purchaser decides to execute a form, he fills in the exact date of the order and the number and type of drugs requested and signs his name to the form. 26 CFR §§ 151.163–151.165; 151.67. The purchaser retains the duplicate and delivers the original and the triplicate thus executed to the seller, who enters the number and size of the stamped packages furnished and the date when each item is filled. 26 CFR §§ 151.161(a); 151.185. A regulation, 26 CFR § 151.201, requires the seller to forward the triplicate to the Internal Revenue Service at the end of the month. Section 4705(d) of the Act requires both seller and buyer

---

2. 26 U.S.C. § 4704(a) provides:
   "(a) General requirement.—It shall be unlawful for any person to purchase, sell, dispense, or distribute narcotic drugs except in the original stamped package or from the original stamped package; and the absence of appropriate taxpaid stamps from narcotic drugs shall be prima facie evidence of a violation of this subsection

by the person in whose possession the same may be found."

3. 26 U.S.C. § 4701 et seq.

4. This claim was raised in an amicus brief but not passed on by the Court. See brief for amicus curiae Cleveland Burgess at 17–20.

to keep their respective copies for a period of two years and to make them accessible to inspection by law enforcement officers." *Id.* at 94–95, 90 S.Ct. at 287–288.

Minor's indictment and conviction for selling narcotic drugs to persons who failed to present a properly executed order form in violation of § 4705(a) was affirmed by the Court. Reading the section to proscribe sale to those who have either failed to register or who could not register because their dealings were illicit, the Court concluded:

> "Confronted with would-be buyers in this class, 'full and literal compliance' with § 4705(a) leaves the seller only one alternative: not to sell. Since from this record it is clear that Minor's customer was not a registered buyer, the alleged possibility of incrimination is purely hypothetical." *Id.* at 97, 90 S.Ct. at 289.

■ In the instant case, Clark was charged with having purchased heroin other than in or from the original stamped package in violation of § 4704(a). As the quoted excerpt describing the scheme of the Act indicates, these stamps are to be affixed by either the producer or the importer after he has paid the tax. None of these tasks is the responsibility of the purchaser, who has only one duty under this section—to avoid purchase of unstamped narcotics. Viewed in this light, it is clear that for Clark, "full and literal compliance" left him with the same alternative which the Court found unobjectionable in *Minor*—not to participate in the transaction.

■ Our view that the stamp provisions of the Act are constitutional as applied to the purchaser of heroin is

strengthened by the realization that a prospective purchaser who has fully complied with the order form provisions (26 U.S.C. § 4705(a)) of the Act and thus is legally entitled to buy narcotics, is still under a duty not to purchase unstamped narcotics and may, under a literal reading of the section involved here, be convicted for violating § 4704(a). Thus Clark's contention that the conviction under Count 2 is a violation of the privilege against self-incrimination is rejected.[5]

### Alleged Violation of Miranda v. Arizona

The defendant's next argument centers on the admission into evidence of remarks he made when stopped by the police on a public street in Pittsburgh. He also objects to the admission into evidence of the narcotics described in the indictment.

The evidence at trial establishes that two Pittsburgh police officers, cruising in a patrol car, first observed a man they identified as the defendant[6] at approximately 9 P.M. on March 15, 1967, walking in a deserted area of the city frequented by litterers. When first observed, the defendant was carrying a brown paper bag. Deciding to "check him out," the officers turned their car and arrived back at the spot from which the first observation had been made in about 35 seconds. They then saw the defendant running toward them without the bag and as the car approached he gestured for the officers to stop. Officer Williams' testimony described the ensuing questioning:

> "Q. Continue, Officer. After the car stopped and you got out, what happened?

5. As a practical matter, there are policy advantages in finding 26 U.S.C. § 4704(a) constitutional now that 26 U.S.C. § 4705 (a) has been upheld in Minor v. United States. The penalty for violation of the former section gives the trial judge discretion to place a first offender-defendant on probation (26 U.S.C. § 7237(a) and (d) (2)), whereas the penalty for viola-

tion of § 4705(a) carries a mandatory minimum sentence of five years and a prohibition on inclusion in the sentence of any provision for probation even for first offenders. See 26 U.S.C. § 7237(b) and (d) (1).

6. Clark claimed at trial that the officer's identification was actually an identification of his twin brother.

"A. Well, upon questioning him as to what he did with the bag he was carrying, he had first stated that he had thrown it in this section here. There was an old sofa there covered with snow and stuff, and I immediately told him, I said, 'You wasn't over in this section because your footprints are not in the snow here.' So, he says, 'Well, maybe I threw it over here.' So, he walks over here, indicating that he threw it over in this section here. Again I told him, 'Well, how could you have thrown it over here? This is the first track that you are making here in the snow.' So, I asked him if he had any identification on him. He said he didn't have any identification, that he had been up there at the Eat and Park to get some sandwiches for his wife, but he had changed his mind. So, I asked him to take the stuff out of his pockets and lay it on the radio car, and he took out of his rear pocket a set of keys. I then patted him and I found nothing else on him. At that time, believing that he was probably trying to evade the littering law, I felt that it was all right since there was nothing but a paper bag anyway, so I told him, 'Okay, beat it out of here.' I then got back in the radio car and he came back up to the radio car and was asking me, 'Well, why did you stop me in the first place?' I said, 'Well, you're lucky to be getting away with questioning. Look at this whole area here. It has been littered with litter and stuff.' I said, 'That is why we are checking this area, to try to stop some of this.' Then he left the radio car and proceeded in this direction."

The narrative is continued by the other policeman, Seifer:

"Q. After Mr. Clark left the cruiser, what did you and your partner do, if anything?

"A. When he left the cruiser, I turned around, went up Dahlem Street, checked the illegally parked car which was not there at that particular address. I said to my partner, 'John, I think we should go back. There is a half inch of snow on the ground and it is unreasonable that we can not find a brown paper bag on a completely white surface.' At which time I made a right, came in Penn Avenue and made another right, and came back.

"Q. Now, from the time Mr. Clark left the police cruiser until the time you returned to the area where you had questioned him, how much time elapsed?

"A. Oh, I would say approximately ten minutes.

"Q. When you got back to the area where you had first stopped and questioned Mr. Clark, was he there?

"A. On my return?

"Q. Yes, sir, on your return to Railroad Street.

"A. No, he was not.

"Q. Was any one there?

"A. No."

Officer Seifer followed a set of footprints leading up a path and about five feet from the path he found a brown paper bag lying inside a rubber tire. The bag contained two plastic juice cartons and inside each carton were numerous small glassine bags, which subsequent analysis revealed to bear defendant's fingerprints and to contain heroin.[7]

■■ Clark maintains that having confessed to a littering offense, he was entitled to be given the requisite warnings, required under Miranda v. Arizona, 384 U.S. 436, 438, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966), where "custodial interrogation" is present, so that all he said after admitting having thrown away the bag should have been excluded, as should the bag itself as a "fruit" of an unlawful interrogation. We need not pass on this contention, since the alleged statements of the defendant were not import-

7. Clark's objection to the admission of the analysis of the contents of these bags is discussed below.

ant evidence needed for the proof of any of the elements of the crimes for which he was charged since the police officers testified that they observed him first with, and then without, the bag. These alleged statements were pertinent in evaluating the credibility of the police officers' testimony by explaining that the officers had returned to the scene 10 minutes later to investigate further because of the evasive and improbable statements concerning disposal of the bag.

Furthermore, defendant's conversation with the officers and the bag of narcotics which they subsequently found were not the products of a custodial interrogation. In seeking to safeguard Fifth and Sixth Amendment rights, the Supreme Court in *Miranda* was nevertheless careful to preserve to the police their role in traditional "on-the-street" inquiries:

> "Our decision is not intended to hamper the traditional function of police officers in investigating crime. * * * General on-the-scene questioning as to facts surrounding a crime in the fact-finding process is not affected by our holding."  384 U.S. at 477, 86 S.Ct. at 1629.

An exact definition for "custodial interrogation" is, by its nature, an impossibility. The problem must, of necessity, be approached on a case-by-case basis. See United States v. Gibson, 392 F.2d 373 (4th Cir. 1968). There was in the instant case, "no evidence of the application of force or intimidation, physical or psychological, actual or implied," Government of Virgin Islands v. Berne, 412 F.2d 1055 (3rd Cir.), cert. den. 396 U.S. 837, 90 S.Ct. 96, 24 L.Ed.2d 87 (1969), and the inquiry was essentially a routine one, Allen v. United States, 129 U.S.App.D.C. 61, 390 F.2d 476, modification refused, 404 F.2d 1335 (D.C.Cir. 1968), with the questioning being conducted during "an inquiry concerning a minor violation" which was "the product of curiosity or even suspicion, but [was] neither addressed to a person in custody or under restraint." James v. United States, 418 F.2d 1150 (D.C.Cir.1969).

Clark was never placed under arrest, even though he may have been "detained". In light of all these factors, we hold that the testimony of Clark's statements was admissible.

Clark's constitutional objection to the admission into evidence of the narcotics found by Officer Seifer is equally without merit for it is clear that it was seeing a man with a bag in a particular area of the city and then, thirty or forty seconds later, seeing the same individual without a bag which led to the search of the vacant property and not the questioning of Clark.

### "Chain of Custody" of Incriminating Evidence

Clark argues that the Government failed to present evidence sufficiently connecting the testimony of the analysis of heroin in, and the identification of his fingerprints on, the packages delivered to the chemist with the contents of the paper bag recovered by the officers from the vacant lot to permit the introduction of this testimony into evidence.

The testimony at the trial reveals that the officers, upon finding the discarded bag, immediately took the two juice cartons they found in the bag to their precinct house where they turned them over to a Sergeant Persetic. They counted the contents and found that one carton contained 171 glassine envelopes while the other contained 176. Both sets were placed in the drawer of the desk at the precinct house. The following morning an Officer Diggs picked up a package at the precinct from an unidentified officer and delivered it to a Mr. Jerpe at the city Crime Lab. Jerpe examined the contents of the bag and tagged it. The next day he turned it over to a chemist who verified that one carton contained 171, and the other 176, glassine envelopes. He emptied 14 of these envelopes selected at random and found that they contained heroin. Several days later over 300 envelopes from the tagged bag were emptied, sent to, and received by the Federal Bureau of Investigation, where eleven latent fingerprints were discovered on

the envelopes. Four of these prints belonged to the defendant.

Clark argues that since the Crime Lab received the bag from an unknown person at the precinct on the morning following its discovery, there is a "break" in the chain of custody necessary to permit introduction of the analysis. Furthermore, he asserts that since there is testimony that 340 empty envelopes were sent by the Crime Lab to the F.B.I., while the F.B.I. testified to receiving only 308 such envelopes from the Pittsburgh facility, there is an inconsistency in the testimony necessitating the exclusion of the fingerprint identification.

Initially, it is noted that the trial judge in the instant case gave a charge [8] on the subject of "chain of custody" after being requested to do so by defense counsel. He concluded by instructing that:

" * * * if you are not convinced beyond a reasonable doubt that those bags on which the defendant's fingerprints were found are the bags that were found by those policemen, Seifer and Williams, out there on Railroad Street or near Railroad Street on the night of March 15, 1967, then this defendant should be acquitted." [9]

A trial judge's determination that the showing as to identification and nature of contents is sufficient to warrant reception in evidence of the results of a test on the article may not be overturned except for a clear abuse of discretion. We find no such abuse of discretion here. See Gallego v. United States, 276 F.2d 914 (9th Cir. 1960). While it is true that an object connected with a crime must be shown to be in substantially the same condition as when the crime was committed before it can be admitted, United States v. S. B. Penick & Co., 136 F.2d 413 (2nd Cir. 1943), the objections which the defendant here makes go to the weight of the evidence rather than to its admissibility and, hence, the question was properly left to the jury. Williams v. United States, 381 F.2d 20, 21 (9th Cir. 1967); United States v. S. B. Penick & Co., supra, 136 F.2d at 415.

For the reasons stated above, the judgment will be affirmed.

8. "I suppose I should have charged you, if I did not, that if the glassine bags in Exhibit 14—that brown bag there that got down to Washington; I think it was sent by Inspector McDaniel to Washington with 308 glassine bags in it—if those glassine bags were not the bags found by Officers Seifer and Williams in the tire on March 15, 1967, then you should disregard the fact that the defendant's fingerprints are on them. Those bags in that box must be bags which those officers found that night and not bags that were found some other time or some other place, and the Government has the burden of proving to you beyond a reasonable doubt that those bags in that box were the bags found by Officers Seifer and Williams that night.

"Now, they have tried to retrace their history in to the Number 5 Police Station and from the police station by Officer Diggs to the crime laboratory and from Mr. Jerpe's hand in the crime lab—if I pronounce his name right—in to the chemist's hands the next day when he analyzed the white substance, and by taking 7 packets from one bag and 7 packets from another bag at random, they tried to convince you that the remaining bags— absent 12 and five sent to some other place—were put by Inspector McDaniel into that box and were sent to the Federal Bureau of Investigation in Washington, and it was on those bags that Mr. Jones found the defendant's fingerprints on three of them. On three of those bags, he found four of the defendant's fingerprints, as I recall the testimony.

"Now, if you are not convinced beyond a reasonable doubt that those bags on which the defendant's fingerprints were found are the bags that were found by those policemen, Seifer and Williams, out there on Railroad Street or near Railroad Street on the night of March 15, 1967, then this defendant should be acquitted.

"Are there any other exceptions?
"Mr. Brown: No, your Honor.
"Mr. Zurawsky: No, your Honor."

9. Whether 340 or 308 envelopes were sent to and received by the F.B.I. is immaterial, since all the testimony is that the envelopes sent to the F.B.I. came from the tagged bag, so that the eleven fingerprints were on envelopes taken from such bag. The charge made clear that the jury had the function of determining the facts.