[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The instant proceeding arose out of a warrantless arrest for an occurrence on June 5, 1999 at approximately 2:30 in the afternoon in which the defendant was charged with unlawful possession of a narcotic substance in violation of § 21a-279(a), and operating a motor vehicle while under the influence of intoxicating liquor in violation of §14-227a(a)(1) of the General Statutes, respectively. On March 9, 2000, she was acquitted on the charge of operating a motor vehicle under the CT Page 12724 influence of intoxicating liquor and found guilty on the narcotics charge. The following facts are found.
On June 5, 1999, at approximately 2:00 o'clock in the afternoon, the defendant entered a business establishment known as Automobile Detailing Window Tinting located on Mill Plain Road in Danbury. The business was owned and operated by one David Silversey, who has been in business for a period of approximately ten (10) years. Silversey who had seen the lady before and knew her as Cindy" asserted that she was yelling and screaming in front of a customer. She was asked to leave, but did not cooperate, and he threatened to call the police. She responded to that threat by saying "go ahead I don't care." True to his word, he called the police. She, seeing him making the telephone call, did a three point turn and pulled slowly out of the driveway. In the telephonic complaint to the police, he recited that there was a woman in his shop, that she seemed intoxicated, and he didn't believe that she was fit to drive an automobile. He described her appearance in terms of her eyes being bloodshot and her color being very pale. After leaving his business, she stopped at the end of the driveway, which was rather lengthy, put the car in park, opened the door, left the door open, and was talking, it seemed, to her car, making erratic movements, waving her hair back. In addition to what was described by Mr. Silversey, he indicated that he had smelled the odor of alcohol on her person. It was not strong, but it was definitely there. His final observation was that she was driving erratically, and was going the wrong way on Mill Plain Road.
A police officer was on routine patrol in the area and received the information derived from the Silversey telephone call, and was directed to respond to the area. He stopped and spoke to the complainant who repeated his observations to him, as well as the conclusion he drew. The officer was also advised that she was driving a blue Toyota automobile bearing New York plates numbers 429CP. He then left the complainant and proceeded to turn onto Mill Plain Road in the direction of New York, as a result of the fact that the vehicle was registered in New York.
As the police officer traveled west bound on Mill Plain Road, he saw a vehicle that matched the description of the subject, which was making a left turn out of a private driveway onto Mill Plain Road traveling east, being operated by a female operator. He made a U-turn.
The officer's observation of the vehicle was for a matter of seconds. After stopping it, he approached, and describes the car as a total mess, full of garbage, with clothing "all over the place." The operator appeared confused, he asked for license, registration and insurance. She first ignored him. She appeared confused and was unable to produce any of those documents with the exception of her license. He asked her to step CT Page 12725 out of the car, and she paid no attention to him. He asked her to step out again, which she did. There was a great deal of fidgeting, her pupils were constricted. He then asked her to perform three field tests. They were the horizontal gaze nystagmus, the walk and turn test, and the one leg stand test. The officer observed a lack of a smooth pursuit of the object, a jerkiness of maximum deviation, and jerkiness prior to maximum deviation. That suggested to him that she was probably under the influence of drugs or alcohol. She was impaired. With respect to the walking and turning test, she was just stumbling about. She lost her balance during the tests and leaned toward the rear of her car to keep her balance. Based upon the information received by the officer, and his own observations, and the results of the testing, he believed that she was incapable of driving as a result of the ingestion of drugs or alcohol. She was placed under arrest.
"In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved." Brinegar v. UnitedStates, 338 U.S. 160, 174-175 (1949). This court is more than satisfied that the factual predicate set forth herein certainly meets that standard.
He seized her purse at the moment but did not search it. It was placed in the front seat of his patrol car. He drove with her to the police station. She was put in a waiting cell. Her purse was placed on a desk which is right next to the cell. He then advised her of additional tests and consequences of failures to take those tests. She agreed to a urine test and then changed her mind and refused to take it. The urine test, which was refused, was in fact attempted by Officer Lourenco. Despite her professed willingness to take the test, she apparently was unable to urinate, and no test was in fact given. She was then offered a breathalyser test. The officer observed her blowing around the tube rather than into it. The test was again demonstrated for her by Officer Lourenco. By this time, the allotted time on the machine had expired and the test was considered as refused.
Thereafter, they returned to the holding area and Officer Lourenco inventoried the defendant's purse. The defendant was standing next to the desk where the purse was being inventoried. That inventory disclosed a plastic bag which was believed to contain cocaine from its appearance and its packaging. A field test for cocaine was positive. The officer then placed the plastic bag in a manila envelope, typed the case number, the usual identification on it, sealed it, initialed it, scotch taped over the seal, put it in the drug evidence box which is located in front of CT Page 12726 the police department. At trial, the officer identified the plastic bag which he had seen Officer Lourenco take out of the purse. He went through the markings on the envelope, including the seal, the breaking of the seal, and thoroughly identified it. Officer Lourenco was going through the purse, found a clear white plastic bag containing a white powdery substance mixed in with other items. With its appearance in packaging, she believed it was cocaine or heroin. The defendant denied that it was hers despite the fact that it was found in her purse.
This search can well be sustained as a search incident to a valid arrest, an inventory search or a community caretaking search. To leave a purse of a woman in custody at the scene of the arrest is hardly appropriate, intelligent or proper police procedure. The fact that the search occurred away from the situs of the arrest is of no significance. To suggest that any police officer should not inventory (search) a purse of one in custody or the clothing of another in custody is pure folly.
On June 7, at approximately noon time, the officer removed the envelope containing the narcotics from the drop box. Officer Hulton testified that there were several additions to the exhibit for identification since that time. The state laboratory wrote a control number on it, affixed the bar coding label, the evidence seal was added, the department had its own seal on the back, the additional evidence seal at the top was placed on there by the state laboratory, and that the exhibit sticker was not on it that day. It was in the same condition as when he retrieved it from the drop box. After noting the time it was retrieved, Officer Hulton took it down the hall and deposited it in the drug evidence room. Thereafter, it was taken to the state laboratory for analysis, which was done. Another Danbury police officer retrieved it from the laboratory on September 21, and brought it back to Danbury. The envelope containing narcotics was sealed at all times except for the Laboratory examination of it.
 There is no hard and fast rule that the prosecution must exclude or disprove all possibility that the article or substance has been tampered with; in each case the trial court must satisfy itself in reasonable probability that the substance had not been changed in important respects. United States v. S. B. Penick Co. [136 F.2d 413, 415 (2d Cir.)], supra. The trial court must also decide under the same test of reasonable probability whether the identification and nature of contents is sufficient to warrant its reception in evidence. United States v. Clark
[425 F.2d 827, 833 (3d Cir.)], supra; United States v. Gallego [276 F.2d 914, 917 (9th Cir.)], supra; United States v. S.B. Penick Co., supra. The court must CT Page 12727 consider the nature of the article, the circumstances surrounding its preservation and custody and the likelihood of intermeddlers tampering with it in making its determination; and there is no rule which requires the state to produce as witnesses all persons who were in a position to come into contact with the substance sought to be introduced in evidence. United States v. Gallego, supra. The ruling of the trial judge may not be overturned except for a clear abuse of discretion. United States v. Von Roeder, 435 F.2d 1004, 1008 (10th Cir.); United States v. Clark, supra; United States v. Gallego, supra. In the case at bar there was no affirmative showing that the [narcotics in the purse (bag) had been] tampered with, or that there was insufficient proof as to the . . . nature of the contents [therein] . . . .
State v. Johnson, 162 Conn. 215, 232, 233 (1972).
The motion to suppress is, accordingly, denied.
Moraghan, J.