

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-27-2004

# USA v. Vidal

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-1071

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"USA v. Vidal" (2004). *2004 Decisions.* Paper 1068.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/1068

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 03-1071

UNITED STATES OF AMERICA

v.

WIFREDO VIDAL,
a/k/a WILFREDO VIDAL

Wifredo Vidal,
                    Appellant

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
D.C. Crim. No. 00-cr-00412
District Judge:  The Honorable Joel A. Pisano

Argued November 18, 2003

Before: RENDELL, BARRY, and CHERTOFF, Circuit Judges

(Opinion Filed:  January 27, 2004)

John A. Young, Jr., Esq. (Argued)
Peter R. Willis, Esq.
Willis & Young
921 Bergen Avenue
Suite 528
Jersey City, NJ 07306

Attorneys for Appellant


Sabrina G. Comizzoli, Esq. (Argued)
George S. Leone, Esq.
Office of the United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102

Attorneys for Appellee

OPINION

BARRY, Circuit Judge

## I. BACKGROUND

Appellant Wifredo Vidal was employed as an electrical inspector and construction code official for Union City, Hoboken, Weehawken, West New York, and Teaneck, New Jersey. He was indicted on June 22, 2000 on seven counts of extorting bribes from business owners seeking permits to complete construction projects, and for filing false tax returns, in violation of 18 U.S.C. § 1951(a) and 26 U.S.C. § 7206(1), respectively. Following trial, Vidal was convicted on four of the six remaining extortion counts and all

seven of the false filing counts, and now challenges his convictions on two grounds. First, he challenges the denial of his motion to suppress statements made to federal agents during the execution of a search warrant at his home. Second, he claims that there was insufficient evidence to convict him of violating the Hobbs Act because his victims were not substantially engaged in interstate commerce.

The material facts relevant to the suppression motion are not seriously disputed but only the legal conclusion to be drawn from those facts. Early on the morning of December 3, 1998, fourteen FBI and IRS agents arrived at Vidal's home to execute a search warrant. Two agents knocked on the front door and waited for him to answer. Twelve other agents waited outside the house or in their vehicles parked on the street, but not blocking the driveway. Vidal's wife answered the door, and the agents showed Vidal the warrant. Vidal's wife then let the agents in, and they did a brief protective sweep to secure the five firearms Vidal told them he owned. Following the sweep, nine agents searched the home for computer records and documents and two agents remained outside. At no point was Vidal frisked, handcuffed, or touched in any way; no firearm was displayed; and Vidal was permitted to dress, albeit accompanied by an agent while he did so.

Three agents questioned Vidal while sitting at his kitchen table with him. The agents testified, and the District Court found, that the questioning lasted approximately an hour and fifteen minutes. Vidal was asked about prices he charged in the course of his

employment, his other sources of income, and his tax liability. According to the agents, Vidal appeared to be "very friendly and hospitable," "forthcoming," "cooperative," "relaxed," and showed no hesitation in answering questions. This behavior purportedly corresponded to his behavior during two previous interrogations at his home in August and October of 1998, during which he was "[v]ery friendly, very hospitable."

Vidal testified, on the other hand, that he was nervous, that he was afraid not to be cooperative in any encounter with law enforcement agents, and that he "felt like [he] was going to faint. [His] heart was going a mile a minute." When asked why he felt this way, Vidal responded:

> Well, you see all of the people around, crowd the house. You don't know what they are looking for. You just woke up. Your heart is going a million miles an hour. You feel kind of dizzy. You know, I have a daughter who is only seven years, will she think about it. A million things going through your mind at the moment.

He believed that he did not have the right to tell the agents he did not feel well and did not want to answer questions, although he admitted that the agents did not say anything that led him to that belief.

Vidal was permitted to move about the house, although only if accompanied by an agent. He was permitted to use the bathroom by himself, but with the door partially ajar; to take his diabetes medication and have a glass of orange juice; and to have his daughter to sit on his lap during the questioning. Had he shown signs of illness, the agents testified, they would have stopped the interview. Had he asked to leave, they also

4

testified, he was free to do so. At no time was he placed under arrest.

Following the interview, Vidal was asked if he had a laptop computer. He responded that he did, and that it was at his office. Vidal consented to a search of his office and signed a written consent form, although he testified that he did not know what he was signing. Vidal accompanied two agents to his office, riding in the front seat of an agent's car. He testified that he felt that he was "directed [ ] to the car" and under arrest, and that he was nervous. After the search, the agents drove Vidal back home.

Vidal moved to suppress the statements during the interview on the ground that he was in custody and interrogated but was never read his Miranda rights. The Honorable Harold A. Ackerman held a suppression hearing and determined that Vidal was not in custody, when he was concededly interrogated, and denied his motion. Vidal was subsequently convicted by a jury before the Honorable Joel A. Pisano[1] in July 2002 and was sentenced by Judge Pisano in December 2002 to 41 months on the Hobbs Act counts, and 36 months on the false tax returns counts, sentences to run concurrently. He now appeals.

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291. We will affirm.

## II. DISCUSSION

---

[1]This case was reassigned to Judge Pisano in March of 2002.

A.	Was Vidal in Custody?

Vidal argues that his Fifth Amendment rights were violated when he was subjected to a custodial interrogation without Miranda warnings having been administered. A "custodial interrogation" is questioning "initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Rhode Island v. Innis, 446 U.S. 291, 298 (1980) (quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966)). The government does not dispute that Vidal was interrogated, but argues that he was not in custody at the time and, thus, that the motion to suppress was properly denied. "This Court reviews the District Court's denial of a motion to suppress for clear error as to the underlying factual findings and exercises plenary review of the District Court's application of the law to those facts." United States v. Perez, 280 F.3d 318, 336 (3d Cir. 2002), cert. denied, 537 U.S. 859 (2002) (citing United States v. Riddick, 156 F.3d 505, 509 (3d Cir. 1998)).

A "custodial interrogation is not susceptible of an exact definition ... the determination ... must be made on a case-by-case basis." United States v. Leese, 176 F.3d 740, 743 (3d Cir. 1999) (citing Steigler v. Anderson, 496 F.2d 793, 798 (3d Cir. 1974), and United States v. Clark, 425 F.2d 827 (3d Cir. 1970)). "[T]he ultimate inquiry is: 'whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'" Id. (quoting California v. Beheler, 463 U.S. 1121, 1125 (1993) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)). "Where, as here, the

6

individual has not been openly arrested when the statements are made, 'something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates they would not have heeded a request to depart or to allow the suspect to do so.'" Leese, 176 F.3d at 743 (quoting Steigler v. Anderson, 496 F.2d 793, 799 (3d Cir. 1974) (quoting United States v. Hall, 421 F.2d 540, 545 (2d Cir. 1969)).

We must use an objective standard when considering the circumstances of Vidal's interrogation. "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 323 (1994). The question is whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112 (1995).

Following the suppression hearing, Judge Ackerman found that "the circumstances in this case do not amount to a custodial setting .... There is no indication in this case that Mr. Vidal's freedom was restricted in any significant way." Specifically, he found that Vidal was not placed under arrest; that Vidal's statements were made in his home, at his kitchen table in an interview of approximately one hour and fifteen minutes; that the agents informed Vidal of the search warrant; that the agents read to Vidal the consent form for searching his office; that Vidal knew exactly what was on the form

7

voluntarily signed it, that at no point was his will overborne; and that Vidal was free to leave. Judge Ackerman was not troubled by the fact that fourteen agents were involved.

We agree that Vidal was not in custody while he was being questioned. First, none of the most obvious indicia of custody were present. Vidal was never formally arrested, frisked, told he could not stop the questioning, or told he could not leave. Furthermore, the interrogation took place in Vidal's home, not in a police station or other more intimidating location.[2]

Second, the record does not show that Vidal was subject to much less overcome by coercive tactics. His requests to get dressed, use the bathroom, and take his medication were honored; he appeared to be calm and was cooperative throughout the questioning; his wife offered the agents coffee; and his daughter sat on his lap. These facts, and others, convince us that this was not a custodial situation. See, e.g., Leese, 176 F.3d at 744 (defendant not in custody where, inter alia, her requests were honored and the record did not show her will was overcome by coercive tactics). And, while we have been given some pause by the number of agents involved, only three agents were with Vidal in the kitchen during the questioning.

_____

[2]We recognize that it is not dispositive that the questioning took place in Vidal's home. See Orozco v. Texas, 394 U.S. 324, 326-27 (1969) (interrogation was custodial even though the defendant's statements were made in his own room at a boarding house, because officers testified that defendant was not free to go). Nevertheless, the location clearly made it less likely, given the other circumstances, that a reasonable person in Vidal's position would have felt he was unable to end the questioning.

8

The denial of the motion to suppress will be affirmed.

B.    Sufficiency of the Evidence

Vidal also argues that his Hobbs Act convictions should be reversed because the evidence does not offer "any substantial nexus between the business(es) [extorted by Vidal] and the possible effect, even marginally, on interstate commerce." He explains – and this is the full extent of his argument – that this is so because there was no evidence that the businesses involved were "customarily engaged in interstate activity" at the time the various extortions took place. The government responds that this is not the standard that it need prove only a de minimis effect on interstate commerce as a result of Vidal's extortions, which it surely did at trial. We review the evidence to determine whether that evidence, viewed in the light most favorable to the government, would allow a rational trier of fact to convict.'" United States v. Hart, 273 F.3d 363, 371 (3d Cir. 2001). The Hobbs Act states that "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do ... shall be fined under this title or imprisoned not more than twenty years, or both." 18 U.S.C. § 1951(a). We have held that the requisite nexus between extortion and interstate commerce can be found in the depletion of assets theory, whereby the payment of an extortion demand reduces the assets available for use by the victim in interstate commerce. See United States v. Jannotti, 673 F.2d 578, 593-94 (3d Cir. 1982) (citing United States v. Cerilli, 603 F.2d 415, 424 (3d Cir. 1979)).

9

In Cerilli, we held that evidence showing that the victims who were extorted could not use the money paid to the defendant to purchase supplies from out of state vendors was a sufficient effect on interstate commerce to support a Hobbs Act conviction, even where that effect was "certainly not very large." Cerilli, 603 F.2d at 424. And recently in United States v. Clausen, 328 F.3d 708 (3d Cir.), cert. denied, 124 S.Ct. 256 (2003), we reaffirmed our holding in United States v. Traitz, 871 F.2d 368 (3d Cir. 1989), that a Hobbs Act conviction can be predicated upon crimes that have only a de minimis impact on interstate commerce.

The evidence in this case was more than sufficient for a rational trier of fact to have found at least a de minimis impact on interstate commerce. The Hobbs Act counts for which Vidal was convicted were predicated on his extorting money from four victims. He extorted $180 from Your Way Construction, a New York company hired to perform renovations in New Jersey, which brought tools and supplies purchased in New York to New Jersey, and sub-contracted with a New York electrician to perform repairs in New Jersey. He extorted $500 from Fenix Bakery, which purchased supplies and services to service its bakeries in New Jersey and Florida. He extorted $200 from Del Plata Auto Repair, which purchased auto parts from out of state. And he extorted $100 from the Made In Ecuador grocery store, which purchased inventory through an importing company in Florida.

Each of the extortions prevented the particular victim from using that money in

10

interstate commerce as was its ordinary course of business.  Furthermore, each victim was also affected by the delay caused by Vidal's refusal to issue permits: Your Way Construction was prevented from working on other sites, and Fenix Bakery, Del Plata Auto Repair, and Made In Ecuador were each closed down for repairs for longer than they would have been had it not been for Vidal's demands.  Each of the delays caused a loss of revenue as well.

The evidence that Vidal's extortions affected interstate commerce was sufficient.

### III. CONCLUSION

The judgment of sentence will be affirmed.

TO THE CLERK OF THE COURT:

Kindly file the foregoing Opinion.

**/s/ Maryanne Trump Barry**
Circuit Judge

RENDELL, <u>Circuit Judge</u>, Dissenting:

Because I believe that the circumstances surrounding Vidal's interrogation amounted to a custodial setting, I respectfully dissent.  Line drawing in these types of fact patterns is admittedly not an exact science.  Discerning whether a defendant was in custody can be a challenge in some cases, but this is not one of them.  Putting ourselves in the place of the reasonable person, unschooled in analyzing how many officers it takes to disincentivize movement, let alone flight, Vidal was undoubtedly confined.

To my mind, the majority commits a fundamental error by viewing this case subjectively, rather than objectively as we must.  <u>Stansbury v. California</u>, 511 U.S. 318, 323 (1994) ("Our decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.").  The panel's observations that Vidal's will was not overborne, that he "appeared calm," that he offered coffee to his interrogators, and that his daughter sat on his lap, are neither necessarily appropriate indicators of Vidal's mindset nor, more importantly, are they relevant to our analysis.  What was on his mind, or his daughter's for that matter, are simply not germane

2

to our review.[3]  Our charge is to look at the facts objectively, as the panel itself acknowledged by referencing <u>Stansbury</u>.  The facts here, viewed objectively, indicate a custodial setting.

Fourteen agents executed a search warrant at 6:15 a.m.  The agents spent a total of three hours with Vidal.  Three officers who had previously "visited" him surrounded him at his kitchen table and then took him to his office to get his computer.  Simply put, this third visit in four months reflected an escalation in force, a "bearing down" on him. <u>See</u> <u>United States v. Leese</u>, 176 F.3d 740, 744 (3d Cir. 1999) (noting that "[t]he more cause for believing the suspect committed the crime, the greater the tendency to bear down in interrogation and to create the kind of atmosphere of significant restraint that triggers Miranda" (quoting <u>Steigler v. Anderson</u>, 496 F.2d 793, 799 (3d Cir. 1974))).  His movements around the house were closely monitored such that, objectively, could he have felt, for even one moment, able to leave the scene?  Indeed, his wife was not even permitted to retrieve a book from her car for their daughter without agents accompanying her.  What would one accused of tax fraud assume all these agents were trying to prevent, if not movement and flight?  The fact that these events took place in Vidal's home is of no moment. The agents effectively transformed the house into an occupied outpost.

We have "signaled our preference for an accusatorial rather than an inquisitorial

---

[3]Indeed, Vidal testified that he believed he was under arrest, and the District Court did not question his credibility.

3

system of justice." <u>Murphy v. Waterfront Comm'n</u>, 378 U.S. 52, 55 (1964), <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>United States v. Balsys</u>, 524 U.S. 666, 690 (1998); <u>see</u> <u>also</u> <u>Rogers v. Richmond</u>, 365 U.S. 534, 541 (1961) (observing "that ours is an accusatorial and not an inquisitorial system" of criminal justice). <u>Miranda</u> makes that preference a reality. <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). <u>Dickerson</u> makes it a constitutional mandate. <u>Dickerson v. United States</u>, 530 U.S. 428, 444 (2000). Here, the prosecution convicted Mr. Vidal based on its inquisitorial tactics, because the things he admitted while sitting at that kitchen table may well have sealed his fate.[4] I do not think the majority's reasoning does justice to this constitutional principle.

---

[4] The accountant's credibility was vigorously attacked by the defense, and Vidal's admissions were emphasized in the prosecutor's opening and closing statements.

TO THE CLERK OF COURT:

Please file the foregoing dissenting opinion.

/s/  Marjorie O. Rendell
Circuit Judge

Dated: January 27, 2004