**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 08-2948
_____

UNITED STATES OF AMERICA

v.

ROBERT RAWLINS,
Appellant

_____

On Appeal from the District Court
of the Virgin Islands
District Court No. 3-04-cr-00154-005
United States District Judge: The Honorable James T. Giles

_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
May 3, 2010

Before: SMITH, CHAGARES, and JORDAN, *Circuit Judges*

(Filed: May 26, 2010)

Mark D. Hodge, Esq.
Hodge & Francois
1340 Taarneberg
St. Thomas, Virgin Islands 00802
    *Counsel for Appellant*

Delia L. Smith, Esq.
Office of United States Attorney
5500 Veterans Drive, Suite 260
St. Thomas, Virgin Islands 00802
    *Counsel for Appellee*

-----

OPINION

-----

SMITH, *Circuit Judge*

Robert Rawlins was a baggage handler for Worldwide Flight Services at Cyril E. King Airport on St. Thomas, United States Virgin Islands. He was caught using that position to help smuggle cocaine through the airport, and was eventually convicted of various drug crimes. Finding no error, we will affirm.

I.

"As required when reviewing convictions, we recite the

2

relevant facts in the light most favorable to the government." *United States v. Leo*, 941 F.2d 181, 185 (3d Cir. 1991).

This appeal arises out of a conspiracy among employees at Cyril E. King Airport, and others, to smuggle cocaine onto commercial flights bound for the continental United States. The conspirators included Alric Thomas, a cocaine supplier; Dion Brookes, the station manager for a small airline called Air Sunshine; and airport baggage handlers Rawlins, Bernard Gabriel, Brent Donovan, Meleek Sylvester, and Mervin Dorival.

This group employed several methods to move cocaine through the airport. The method the conspirators used most often was what we will refer to for purposes of this opinion as "tag switching" or "tag pulling." The word "tag" refers to the flight tags that airlines affix to checked luggage. All luggage to be loaded onto commercial aircraft requires such a tag. The switching the conspirators engaged in involved stealing flight tags from legitimately checked bags and affixing those tags to bags containing cocaine. This method allowed the cocaine to be smuggled into the cargo holds of U.S.-bound commercial airplanes.

The main workspace for the tag-switching operation was the airport's baggage room. It was located behind the ticket counters of several airlines, including Air Sunshine, as well as the Transportation Security Administration ("TSA") inspection area. The room had two baggage belts, both of which held

3

checked luggage intended for outgoing flights. A conspiring baggage handler was able to select a bag that was bound for a destination where he intended to direct the cocaine. He would remove the bag's flight tag, steal any valuables found inside, then discard the plundered bag. The stolen flight tag would then be taken to Air Sunshine's ticket counter or office, where Brookes was paid to hold unchecked, uninspected, untagged bags filled with cocaine.[1] The tag would be transferred to one of the drug bags, making it appear that the bag had been checked and inspected in the ordinary course. A baggage handler would then transport that bag to the baggage room and place it among other checked baggage. Finally, the bag containing drugs would be loaded onto the flight denoted on the flight tag, along with legitimately checked bags.

The earliest evidence of Rawlins's involvement in this operation pertained to the events of September 20, 2003. The day before, Thomas had given Sylvester three suitcases filled with cocaine, along with $60,000 in cash. Two bags were to be loaded onto a flight to Philadelphia; the third was destined for Newark. As agreed, Sylvester brought the suitcases to the airport on September 20. Brookes and Dorival took them and stored them in the Air Sunshine office. Brookes held the three bags in his office until Rawlins delivered the tags that would allow the two bags bound for Philadelphia to be loaded onto the

---

[1] These bags were supplied by Thomas and delivered to the airport by an intermediary, such as Sylvester.

4

plane.[2]  Either Rawlins or Brookes affixed the tags to the bags. Rawlins then carried the two bags to the baggage room.

Unfortunately for the conspirators, the tag pullers made a mistake that day.  They failed to discard the legitimate Philadelphia-bound bags from which the two flight tags had been stolen.  A baggage handler who was not involved in the conspiracy was loading those bags onto the plane when he noticed that they lacked the necessary flight tags.  He and a colleague alerted TSA, which in turn ordered an X-ray scan of all luggage intended for the Philadelphia flight.  The scan revealed the two "replacement" bags filled with cocaine.  The third bag that Sylvester had delivered to the Air Sunshine office, however, remained there undiscovered.  Sylvester contacted Rawlins and told him that the Air Sunshine office held a suitcase containing ten kilograms of cocaine. Rawlins agreed to retrieve the suitcase, and returned it to Sylvester around 7:00 or 7:30 that evening.

Rawlins's involvement in cocaine smuggling at the airport continued.  On November 8, 2003, he removed a flight tag from a checked bag in the baggage room, placed it in his

_____

[2]  Donovan testified that he brought the tags to the office that day, but Brookes offered testimony from which the jury could have concluded that Rawlins did so instead.  Taking the evidence in the light most favorable to the government, as we must, we credit the testimony implicating Rawlins.

pocket, and took it to Brookes's office. He returned with a tagged blue bag, which he placed on the baggage belt. Later that day, officials in Newark, New Jersey intercepted a cocaine-filled bag that had been placed on Continental Flight 1902 from St. Thomas.[3] Rawlins was also tied to a cocaine-filled suitcase discovered on February 21, 2004. Donovan obtained two tags and brought them to Brookes. Brookes informed him that he needed only one tag, so Donovan placed one tag on the drug bag and restored the other to the luggage from which it had been taken. Donovan testified that Rawlins was "involved with that transaction," and that Rawlins took the tagged drug bag to the baggage room. This bag, too, was bound for Newark on Continental Flight 1902, but Customs and Border Protection ("CBP") officers discovered and seized it before the flight departed.

The next relevant incident occurred on March 10, 2004. The day before, Sylvester had received two kilograms of cocaine from Thomas. Thomas instructed him to place the cocaine in a particular green suitcase that would be checked onto Flight 1902

---

[3] Rawlins may have similarly aided a drug shipment to Miami on May 1, 2004. Donovan, who by this time was cooperating with law enforcement, brought a cocaine-filled suitcase to the airport. He gave it to Brookes, who took it to the Air Sunshine front desk. Rawlins promised Donovan that he would obtain tags to place on the luggage, but it is unclear whether he actually did so.

6

by an unidentified female. Rawlins was slated to help Sylvester, but backed out at the last minute, leaving Sylvester to pack the cocaine into a suitcase by himself. Rawlins was present in the baggage room, however, along with Gabriel, as Sylvester packed the cocaine. Indeed, Sylvester asked Rawlins if he would look out for him while he packed the cocaine, and Rawlins told him to "go ahead." Sylvester then built a wall of suitcases to conceal what he was doing from security cameras in the room. He placed the cocaine in the suitcase, and the suitcase made it onto the flight. Immigration and Customs Enforcement ("ICE") agents had been tipped off about the bag, however, and the drugs were seized at Newark Airport. After this incident, Rawlins frequently remarked to Sylvester about how easy it was to place drugs onto airplanes, and begged to be put in contact with a supplier he could work with on his own.

Meanwhile, Sylvester informed Thomas that he no longer wished to assist with drug smuggling. When Thomas inquired about possible replacements, Sylvester told Thomas he would get back to him. On August 30, 2004, Sylvester called Thomas and told him he had found someone to help him. He called Rawlins the same day and arranged a meeting between himself, Rawlins, and Thomas.[4] Before Thomas arrived, Sylvester asked Rawlins if he had "work[ed] anything recently." Rawlins

---

[4]    On August 13, 2004, Sylvester entered into a cooperation agreement with the government. He set up the meeting with Thomas and Rawlins pursuant to that agreement.

responded that he had moved drugs through the airport on Wednesday, August 25, 2004. When Thomas arrived, Sylvester introduced him to Rawlins and the three men talked about smuggling drugs through the airport. Rawlins offered to help Thomas move drugs on American Airlines flights to Miami and New York, and the two exchanged cell phone numbers before parting ways.

There was also evidence corroborating Rawlins's involvement in the cocaine smuggling operation that was not attributed to a specific date. For example, Donovan testified that baggage handlers often acted as lookouts for each other while tag-switching occurred in the baggage room, and that Rawlins had served as a lookout for him in the past. Brookes identified Rawlins as one of the bag handlers whom Dorival would send to pick up cocaine-filled bags stored in the Air Sunshine office, though he did not say when or how often this occurred. He also testified that Rawlins once paid him $2,000 to hold a bag containing cocaine.

Rawlins and his cohorts were eventually arrested. A superseding indictment returned on January 13, 2005 charged Rawlins, Sylvester, Brookes, Dorival, Gabriel, and others with various drug crimes. Count One charged Rawlins and eleven others with conspiracy to possess with intent to distribute five or more kilograms of cocaine, in violation of 21 U.S.C. § 846. Rawlins was also charged in Counts Four, Five, Six, Seven, Ten, and Eleven with aiding and abetting possession of cocaine with

8

intent to distribute. *See* 21 U.S.C. § 841. A jury convicted him on Counts One, Six, Seven, Ten, and Eleven.[5] Count Six related to the drugs seized on September 20, 2003; Count Seven to the drugs seized on November 8, 2003; Count Ten to the drugs seized on February 21, 2004; and Count Eleven to the drugs seized on March 10, 2004.

Rawlins was sentenced to 162 months in prison. He filed this timely appeal raising a grab bag of challenges to his conviction.[6] Rawlins challenges the sufficiency of Count One of the indictment, and the sufficiency of the evidence against him on several other counts. He also contends that the District Court abused its discretion by admitting samples of cocaine into evidence at trial, because the government failed to establish an adequate chain of custody connecting the cocaine seized by authorities and the cocaine tested by government chemists.

## II.

We begin with Rawlins's argument that the superseding

---

[5] On Counts Four and Five, the District Court entered a judgment of acquittal for Rawlins pursuant to Rule 29 of the Federal Rules of Criminal Procedure.

[6] Our jurisdiction arises under 28 U.S.C. § 1291. The District Court had jurisdiction under 18 U.S.C. § 3231 and 48 U.S.C. § 1612(a).

indictment was invalid because Count One failed to allege a proper timeframe for the alleged conspiracy. Specifically, Count One alleged a conspiracy running "from a time unknown and continuing to September[] 2004, on St. Thomas, in the District of the Virgin Islands, and elsewhere[.]" Rawlins argues that the indictment was inadequate because it did not specify when this alleged conspiracy began. His argument starts with the non-controversial premise that the essence of conspiracy is agreement. He contends that every agreement, by definition, is reached at a discrete point in time, and that this requires that an indictment setting forth a conspiracy charge must identify the date the agreement was formed. Because Rawlins did not raise this claim in the District Court, we review for plain error. *United States v. Fuchs*, 467 F.3d 889, 900 (5th Cir. 2006) (applying plain error review to unpreserved challenge to the sufficiency of the indictment); *United States v. Stein*, 233 F.3d 6, 22-23 (1st Cir. 2000) (same). "Plain" error is that which is "obvious" and affects the defendant's substantial rights. *United States v. Evans*, 155 F.3d 245, 251 (3d Cir. 1998).

We use a two part test to measure the sufficiency of an indictment. First, the indictment must "contain[] the elements of the offense intended to be charged and sufficiently apprise[] the defendant of what he must be prepared to meet." *United States v. Hodge*, 211 F.3d 74, 76 (3d Cir. 2000) (quoting *Gov't of the Virgin Islands v. Moolenaar*, 133 F.3d 246, 248 (3d Cir. 1998)). Second, it must "enable[] the defendant to plead an acquittal or conviction in bar of future prosecutions for the same

10

offense." *Id.* Both of those requirements were met here.

As to the first, we join the Ninth Circuit in holding that "although an indictment cannot be completely open-ended, an indictment that specifies an end date is sufficient to apprise defendants of the charges and enable them to prepare a defense[.]"[7] *United States v. Forrester*, 592 F.3d 972, 983 (9th Cir. 2010) (internal citations omitted). *See also United States v. Pease*, 240 F.3d 938, 943 (11th Cir. 2001) (upholding indictment alleging a conspiracy "[f]rom an unknown date through on or about July 21, 1998"); *United States v. Hristov*, 466 F.3d 949, 954 (11th Cir. 2006) (recognizing in dicta the sufficiency of an indictment that charged a conspiracy running from "an unknown date through September 9, 2003"). Rawlins mounted a vigorous defense at trial, and he does not explain how he would have been aided by greater specificity in the indictment. He invokes *United States v. Cecil*, 608 F.2d 1294 (9th Cir. 1979). Yet in *Cecil*, the indictment alleged a drug conspiracy "beginning *on or before* July, 1975, and continuing thereafter *until on or after* October, 1975[.]" *Id.* at 1295 (emphasis added). The Ninth Circuit reversed the defendants' convictions because the indictment failed to allege "sufficient

---

[7] We have previously upheld a conviction based on an indictment charging a conspiracy from a "date unknown [to] September 8, 1999." *United States v. Givan*, 320 F.3d 452, 457 (3d Cir. 2003). We did so, however, without analyzing the sufficiency of the "date unknown" language.

11

facts to facilitate the proper preparation of a defense and to ensure that the defendants were prosecuted on facts presented to the Grand Jury." *Id.* at 1297. It held that the indictment failed to place the conspiratorial acts within any particular timeframe because the language describing the dates of the conspiracy was "open-ended in *both directions*." *Id.* (emphasis added). The case before us is distinguishable, because the timeframe of the charged conspiracy was open-ended only as to the beginning date. Count One explicitly identified September 2004 as the end of the conspiracy. This was sufficient to inform Rawlins of the charges he would face at trial, allowing him to adequately prepare for trial. *Forrester*, 592 F.3d at 983; *Pease*, 240 F.3d at 943.

We further hold that Rawlins's conviction on Count One will afford him a basis to invoke double jeopardy in future proceedings.[8] *Hodge*, 211 F.3d at 76. While Count One did not provide a starting date for the alleged conspiracy, it did supply many other details. It identified the statute Rawlins was charged with violating, ten of his alleged co-conspirators, and the object, manner, means, location, and end date of the alleged conspiracy. *See Forrester*, 592 F.3d at 983. It also detailed at least fifteen

---

[8] "The Double Jeopardy Clause prohibits the government from 'splitting one conspiracy into several prosecutions.'" *United States v. Rigas*, __ F.3d __, No. 08-3218, 2010 WL 1880366 (3d Cir. May 12, 2010) (en banc) (quoting *United States v. Becker*, 892 F.2d 265, 268 (3d Cir. 1989)).

12

overt acts taken in furtherance of that conspiracy, and the approximate date of each. "Uncertainty regarding a conspiracy's beginning and ending dates does not render an indictment fatally defective so long as overt acts alleged in the indictment adequately limit the time frame of the conspiracy." *Id.* (citing *United States v. Laykin*, 886 F.2d 1534, 1542 (9th Cir. 1989)). Here, the indictment alleged that the first overt act occurred in November of 2002, when Gabriel allegedly transported a suitcase containing a kilogram of cocaine to New York, and that the last occurred on August 30, 2004. These allegations "adequately limit[ed] the time frame of the conspiracy." *Id.* All in all, "the indictment was sufficient to apprise [Rawlins] of the charges against him, enable him to prepare a defense, and to avoid double jeopardy on the same charge." *Id.* We find no error, let alone plain error.

We reach our conclusion not only by reference to precedent, but also taking into account the practical realities of most criminal enterprises. By definition, conspiracies work in furtherance of illegal ends. In the usual course, they are inherently secretive affairs. *See, e.g.*, *United States v. Curry*, 977 F.2d 1042, 1053 (7th Cir. 1992). They are ordinarily formed by tacit agreement, *United States v. McKee*, 506 F.3d 225, 238 (3d Cir. 2007), and are unlikely to "operate with the paper trail that generally accompanies legitimate business agreements." *United States v. Price*, 13 F.3d 711, 728 (3d Cir. 1994). For these reasons, only the conspirators may know precisely when their unlawful combination came into being. It

13

is unrealistic to expect that in every case a grand jury will be able to identify that date, despite an abundance of evidence before it. Recognizing this practical reality, we decline to impose such a requirement.

## III.

Rawlins argues that there is insufficient evidence of *mens rea* to sustain his convictions on Counts Six, Ten, and Eleven. In reviewing the sufficiency of the evidence, we apply a "particularly deferential" standard which imposes a "very heavy burden" on the appellant. *United States v. Cothran*, 286 F.3d 173, 175 (3d Cir. 2002) (citing *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998)). "We must sustain the verdict if, viewing the evidence in the light most favorable to the Government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Introcaso*, 506 F.3d 260, 264 n.2 (3d Cir. 2007). "In making our review we examine the totality of the evidence, both direct and circumstantial. We must credit all available inferences in favor of the government." *United States v. Gambone*, 314 F.3d 163, 170 (3d Cir. 2003) (citations omitted). "[I]n order to convict a defendant of aiding and abetting, the government must prove that 'the defendant charged with aiding and abetting that crime knew of the commission of the substantive offense and acted with the intent to facilitate it.'" *United States v. Kemp*, 500 F.3d 257, 293 (3d Cir. 2007) (quoting *United States v. Dixon*, 658 F.2d 181, 189 n.17 (3d Cir.

14

1981)). "[C]ircumstantial evidence can be sufficient to uphold an aiding and abetting conviction." *United States v. Soto*, 539 F.3d 191, 195 (3d Cir. 2008).

We begin with Count Six. Rawlins claims that there is no proof that he knew that the luggage he moved from the Air Sunshine office to the baggage room on September 20, 2003 contained cocaine. According to Rawlins, because his job was to handle bags, no culpability can attach to the mere act of his moving luggage from one location to another without direct evidence that he knew that those bags contained cocaine. We disagree. As described above, the tag-switchers' *modus operandi* was to (1) store bags containing cocaine with Air Sunshine; (2) remove flight tags from legitimately checked luggage; (3) bring those tags from the baggage room to Air Sunshine; (4) affix the tags to the bags of cocaine; and then (5) take those bags from the Air Sunshine office to the baggage room, to be loaded onto the appropriate flight. Brookes repeatedly identified Rawlins as one of the baggage handlers whom Mervin Dorival sent to switch tags and move cocaine-filled bags from the Air Sunshine office to the bag room. As for the events of September 20, 2003, Sylvester testified that he gave Brookes the three cocaine-filled suitcases that Thomas had given him the previous night. Brookes held those suitcases in his office until Rawlins delivered the flight tags that would allow two of them to be placed onboard a flight to Philadelphia. Either Rawlins or Brookes affixed the stolen tags to the drug-laden bags before Rawlins transported those bags to the baggage

15

room. The jury could have reasonably inferred that Rawlins's participation in the highly irregular (and plainly illegal) act of tag switching evidenced his knowledge of the cocaine smuggling occurring through Brookes's office, and his intent to facilitate it.

That conclusion is buttressed by evidence of Rawlins's eager participation in cocaine smuggling at the airport on later occasions,[9] including his actions later on September 20. Sylvester testified that although authorities had seized two of the suitcases containing cocaine, a third remained in the Air Sunshine office. He called Rawlins, told him that there was a suitcase containing ten kilograms of cocaine in Brookes's office, and asked him to retrieve it. Rawlins complied. This demonstrated his willingness to facilitate the drug-running that was occurring through Brookes's office by preventing authorities from discovering the third bag. It is possible, of course, that the evening of September 20 was the first time that Rawlins had anything to do with cocaine, and that he knew nothing of the contents of the suitcases he took to the baggage room earlier that morning. But a rational jury considering the totality of the evidence could have reasonably believed otherwise. *See United States v. Iafelice*, 978 F.2d 92, 97 n.3 (3d Cir. 1992) ("There is no requirement . . . that the inference

---

[9] For example, Rawlins was seen pulling flight tags on November 8, 2003, and he promised Donovan he would do the same on May 1, 2004.

16

drawn by the jury be the only inference possible or that the government's evidence foreclose every possible innocent explanation."). We therefore reject Rawlins's sufficiency of the evidence challenge to his conviction on Count Six.

Rawlins's argument concerning Count Ten is similar to his argument on Count Six. He contends that the trial evidence proved only that he, a baggage handler, moved bags containing cocaine on February 21, 2004. According to Rawlins, this was insufficient evidence from which a rational jury could conclude that he aided and abetted cocaine possession. Again, we disagree. Donovan testified that he pulled intact flight tags from legitimately tagged bags and brought them to Brookes's office for placement on bags filled with drugs. He also testified that Rawlins was "involved with that transaction," and that Rawlins carried the bag from the office to the baggage room. In light of the substantial evidence of Rawlins's involvement in the cocaine conspiracy, including its tag-switching activities, the jury could have reasonably understood this to mean that Rawlins knowingly carried out a small but crucial role that day by moving tagged, cocaine-filled suitcases from the Air Sunshine office to the baggage room.

Finally, there is sufficient evidence to sustain Rawlins's conviction on Count Eleven. Sylvester testified that on March 9, 2004, Thomas paid him $4,000 and gave him two kilograms of cocaine. Sylvester was to bring the cocaine to the airport the next day and, with help from Rawlins, place it in a suitcase

17

bound for Newark. Rawlins backed out at the last minute, however, leaving Sylvester to load the cocaine by himself. He did so in the baggage room, while Gabriel and Rawlins were present. Sylvester not only told Rawlins what he was doing, but also asked him to act as a lookout. In response, Rawlins told him to "go ahead."[10] The jury could have concluded from this evidence that Rawlins acted as a lookout and thereby aided and abetted Sylvester's cocaine possession, as charged in Count Eleven. *See United States v. Barber*, 429 F.2d 1394, 1397 n.4 (3d Cir. 1970) ("[T]he fact that an individual has served as a lookout during the commission of a crime is a clear indication of participation in the wrongdoing.").[11]

IV.

Rawlins also argues that the District Court erred by admitting certain packages of cocaine into evidence at trial. He asserts that the government failed to establish a sufficient chain

---

[10] Sylvester's account was consistent with Donovan's testimony that Rawlins had acted as a lookout for him, and that baggage handlers often acted as lookouts for each other in the baggage room.

[11] Rawlins's Statement of Issues suggests a challenge to the sufficiency of the evidence on Count Seven, but Rawlins waived that issue by failing to develop it in the argument section of his brief. *Mitchell v. Celone*, 389 F.3d 86, 92 (3d Cir. 2004).

of custody showing that those cocaine samples were the same substances seized on the occasions described in the indictment.

Physical evidence must be authenticated before it is admitted. Authenticity is elemental to relevance, for "evidence cannot have a tendency to make the existence of a disputed fact more or less likely if the evidence is not that which its proponent claims[.]" *United States v. Branch*, 970 F.2d 1368, 1370 (4th Cir. 1992). "The requirement of authentication . . . is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). "Establishing a chain of custody is one form of proof sufficient to support a finding that the matter in question is what its proponent claims." *United States v. Mendel*, 746 F.2d 155, 166 (2d Cir. 1984). *See also United States v. Howard-Arias*, 679 F.2d 363, 366 (4th Cir. 1982) ("The chain of custody rule is but a variation of the principle that real evidence must be authenticated prior to its admission into evidence.").

To establish a chain of custody sufficient to make evidence admissible, the proponent "need only prove a rational basis from which to conclude" that the evidence is what the party claims it to be. *Mendel*, 746 F.2d at 167. In other words, in a criminal case, the prosecution must offer sufficient "evidence from which the trier [of fact] could reasonably believe that an item still is what the [government] claims it to be." *United States v. Mejia*, 597 F.3d 1329, 1336 (D.C. Cir. 2010) (quoting 2 Kenneth S. Broun *et al.*, *McCormick on Evidence* §

19

213 (6th ed. 2009)).  This "burden is not a heavy one."  5 Christopher B. Muller & Laird C. Kirkpatrick, *Federal Evidence* § 9:1 (3d ed. 2007).

We have long rejected the proposition that evidence may only be admitted if a "complete and exclusive" chain of custody is established.  *United States v. DeLarosa*, 450 F.2d 1057, 1068 (3d Cir. 1971).  *See also* 2 Broun *et al.*, *supra*, § 213 (explaining that "a complete chain of custody need not always be proved"); 31 Charles Alan Wright & Victor Gold, *Federal Practice and Procedure* § 7106 (1st ed.) ("It is usually unnecessary to establish a perfect or unbroken chain of custody.").  "[S]erious" gaps may render a chain of custody so deficient that exclusion is required, *Mejia*, 597 F.3d at 1336, but in the ordinary case gaps in the chain go to the weight of the evidence, not its admissibility, *Melendez-Diaz v. Massachusetts*, 557 U.S. __, 129 S. Ct. 2527, 2532 n.1 (2009) (quoting *United States v. Lott*, 854 F.2d 244, 250 (7th Cir. 1988)).  *See also United States v. Clark*, 425 F.2d 827, 833 (3d Cir. 1970); *Mejia*, 597 F.3d at 1335; 5 Mueller & Kirkpatrick, *supra*, § 9:10 (collecting cases). Furthermore, a trial court's ruling about the adequacy of a chain of custody is afforded great deference.  It may not be overturned absent a "clear abuse of discretion."  *United States v. Jackson*, 649 F.2d 967, 973 (3d Cir. 1981).

Rawlins challenges the adequacy of the chain of custody for packages of cocaine seized on three occasions: November 8, 2003 (the drug seizure that gave rise to Count Seven), February

20

21, 2004 (Count Ten), and March 10, 2004 (Count Eleven).  We conclude that the District Court's decision to admit each of these packages into evidence was not an abuse of discretion.

Gregory Reardon, a CBP Supervisor stationed in Newark, New Jersey, testified that he set up and oversaw the November 8, 2003 enforcement operation (Count Seven).  An X-ray scan of all luggage emerging from Continental Flight 1902 revealed one suitcase containing an anomalous-looking package. Reardon grabbed that suitcase, and after observing a canine hit on the bag, opened it.  Inside he found a brown taped package containing a white powdery substance that field-tested positive for cocaine.  He testified that he turned over to "the special agents in ICE" both the package and the suitcase in which it was discovered.  ICE Special Agent Bradley Benwell testified that the narcotics seized from Flight 1902 were turned over to him (though he did not say by whom), and that they were transported to the "main office" in Newark and placed in the Newark drug evidence room.  He identified Government Exhibit 64 as the suitcase seized on November 8, but it does not appear that he was asked to identify the drugs themselves.  Later, Maureen Craig, a DEA chemist stationed in New York City, testified that she analyzed drugs seized in connection with Flight 1902 on November 8, 2003.  She testified that she "took the evidence out from the main vault," performed a series of tests, and determined that the objects contained approximately four kilograms of cocaine.  She further testified that Government Exhibits 70 and 71 were the same drug samples she had

21

analyzed.

Richard Peak, a CBP officer stationed at Cyril E. King Airport, testified that he was the seized property custodian for the drugs discovered on February 21, 2004 (Count Ten). He stated that he took possession of a green suitcase containing "some bricks of a substance" and placed both the suitcase and the bricks in the seized property locker at the Federal Building. He testified that the evidence had been "maintained in our seized property locker . . . since that time." Similarly, ICE Special Agent Louis Penn testified that both the suitcase and the drugs seized on February 21 were escorted to the seized property room at the Federal Building. Enrique Pinero, a DEA chemist stationed in Virginia, was later asked if he had performed tests on bricks that were "seized from St. Thomas, Virgin Islands on or about February 21st, 2004." Pinero answered in the affirmative. He testified that Government Exhibit 69 was the "evidence" (*i.e.*, cocaine) that he received at the lab, and that after he received the samples, he kept them "in a lock up" until he had a chance to perform his tests. He confirmed that the bricks he tested contained over two kilograms of cocaine.

As for the drugs seized on March 10, 2004 (Count Eleven), ICE agent Michael Perreaul testified that he was present at Newark Airport as officers X-rayed the luggage from Continental Flight 1902 from St. Thomas. He explained that while this inspection was in progress, an inspector approached

22

him and handed him a bag containing two brick-shaped objects. He testified that he removed the bricks, placed them in a bag, and then signed the bricks over to Agent Benwell. Agent Benwell confirmed that the drugs were turned over to him (though again he did not say by whom), and testified that he placed them in the Newark drug evidence room. Ramona Montreuil, a DEA chemist stationed in New York City, testified that she analyzed the evidence seized from Flight 1902 in March 2004. She stated that she "obtained the evidence and opened it," and after performing a series of tests, determined that the objects tested contained just over two kilograms of cocaine. She testified that Government Exhibits 72 and 73 were the drugs she tested and the same substances seized in Newark on March 10, 2004.

Rawlins argues that the chain of custody of the drugs seized each day was broken because there was no evidence connecting the drugs that were placed in evidence lockers on each occasion to the drugs that were received and tested by DEA chemists. We agree. With respect to the cocaine seized on November 8, DEA chemist Craig testified that she "took the evidence out from the main vault," but Craig was stationed in New York City while Agent Benwell testified that he placed the drugs in the Newark evidence room. It was never established whether Craig retrieved the cocaine herself from Newark, or whether those drugs were at some point transferred from Newark to what Craig called the "main vault" in New York

23

City.[12] Concerning the cocaine seized on February 21, there was no explanation of how drugs placed in the evidence locker on St. Thomas ended up in Pinero's lab in Virginia. Finally, as to the cocaine seized on March 10, there was only Montreuil's testimony that she "obtained" the evidence seized on that date, "opened it," and then tested it. Again, there was no explanation of how a DEA chemist in New York City acquired evidence that was initially stored in Newark. Montreuil testified that the drugs she tested were the same drugs seized on March 10, 2004, but she lacked the personal knowledge necessary to make that assertion. The most she could say was that she tested a substance; the substance was cocaine; and the sample introduced at trial was the same one that she tested. The same is true of Craig's testimony that she tested the "samples seized in connection with [Flight 1902] on or about November 8, 2003," and Pinero's claim that he tested "bricks that were seized from St. Thomas on or about February 21, 2004."

Despite the foregoing gaps in the chain of evidence, we cannot say that the District Court erred by admitting that

---

[12] Furthermore, there is at least the possibility of a gap between Reardon and Benwell. Reardon testified that he turned the drugs over to unnamed ICE agents, while Benwell, an ICE agent, testified that the drugs were turned over to him but he did not say by whom. The exchange may well have been directly from Reardon to Benwell, but the government hardly nailed this down.

evidence at trial. Our conclusion is driven by two considerations. The first is the deference we owe the District Court in resolving disputes of this nature. We cannot overturn its conclusion as to the sufficiency of the chain of custody absent a "clear abuse of discretion." *Jackson*, 649 F.2d at 973. Here, none of the chains at issue was so deficient that there was no "rational basis" for concluding that the evidence was what the government claimed. *Mendel*, 746 F.2d at 167. The testimony of government witnesses created a "reasonable probability" that the cocaine packages seized on November 8, February 21, and March 10 were the same materials tested by DEA chemists and introduced at trial. *Mejia*, 597 F.3d at 1336. Each chain could—and should—have been far stronger than it was. But any weakness goes to the weight of the evidence, not its admissibility.[13] *Clark*, 425 F.2d at 833.

The second consideration is the presumption of regularity in the handling of evidence by law enforcement. "Absent actual proof of tampering, a trial court may presume regularity in public officials' handling of contraband." *Dent*, 149 F.3d at 188. *See also United States v. King*, 356 F.3d 774, 779 (7th Cir.

---

[13] The adequacy of the chain is assessed in light of the "nature of the article, the circumstances surrounding the preservation and custody of it, and the likelihood of intermeddlers tampering with it." *DeLarosa*, 450 F.2d at 1068. Rawlins does not explain how any of these factors weigh against the District Court's admissibility ruling.

25

2004) (applying "presumption of regularity when evidence is within official custody"); 5 Mueller & Kirkpatrick, *supra*, § 9:10 (citing cases). We employ the same presumption here. *See, e.g.*, *Dent*, 149 F.3d at 188; *Jackson*, 649 F.2d at 973-74. No allegation has been made, nor proof offered, of tampering with any of the evidence at issue. Therefore, we presume that the evidence placed in storage was properly transmitted to each of the chemists who testified.[14] The District Court did not err in admitting it.

V.

We have considered the remainder of Rawlins's arguments and find them to be without merit. For the reasons stated, the judgment will be affirmed.

---

[14] Our reliance on this presumption should not be taken as approval of the prosecutor's slipshod handling of this issue at trial.