NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 20-3203
_____

UNITED STATES OF AMERICA

v.

CHARLES ESHAM,
                                    Appellant

_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. Criminal No. 1-17-cr-00071-001)
District Judge: Honorable Richard G. Andrews

_____

Submitted Pursuant to Third Circuit L.A.R. 34.1
on August 10, 2022

Before: AMBRO, SCIRICA, and TRAXLER[*], *Circuit Judges*.

(Filed: September 9, 2022)

_____

OPINION[**]

_____

---

[*] Honorable William Traxler, Senior Circuit Judge, United States Court of Appeals for the Fourth Circuit, sitting by designation

[**] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

**SCIRICA**, *Circuit Judge*

Dr. Charles Esham appeals his jury convictions for Conspiracy to Distribute Oxycodone and Distribution of Oxycodone, as well as his sentence. Because the Government produced sufficient evidence to support Dr. Esham's convictions and because the District Court's sentence was not unreasonable, we will affirm his convictions and sentence.

I.

In 2009, Dr. Esham commenced an internal medicine practice at his home office in North Wilmington, Delaware. Two years later, he took on Lawrence Brinkley as a new patient. Brinkley sought medical treatment for several ailments, including lower back pain suffered from a car accident. Brinkley told Dr. Esham the only drug that relieved his pain was Oxycodone and that he had previously taken dosages of 30 milligrams (mg). Dr. Esham prescribed 30-mg doses of Oxycodone for Brinkley's back pain. Six months later—between December 2012 and January 2013—Dr. Esham learned Brinkley had also obtained an Oxycodone prescription from another doctor.[1] During the same time period, Dr. Esham reviewed x-rays revealing no structural damage to Brinkley's back. Yet Dr. Esham continued to prescribe Brinkley 100 30-mg pills of Oxycodone every month between 2013 and 2016.

But Brinkley did more than request Oxycodone for himself. In 2014, Brinkley began bringing pseudo-patients to Dr. Esham for Oxycodone prescriptions. These

---

[1] This is commonly known as "double dipping" or "doctor shopping." *See* JA933.

patients included Charles Sweet, Robert Ingram, Stephen Cooper, and Heather Miller. Unbeknownst to Brinkley and Dr. Esham, Stephen Cooper and Heather Miller were Drug Enforcement Administration ("DEA") cooperators.

In June 2014, Brinkley introduced Dr. Esham to Sweet and Ingram. Dr. Esham wrote sixteen prescriptions for Sweet, even though Sweet did not usually visit Dr. Esham's office. Instead, Dr. Esham gave Sweet's prescriptions to Brinkley in exchange for a $100 "office visit" fee. Dr. Esham also wrote five Oxycodone prescriptions for Ingram without meeting him, again giving the prescriptions to Brinkley instead. Brinkley, Sweet, and Ingram each sold Oxycodone pills they obtained from these prescriptions.

In September 2015, Brinkley approached his acquaintance, Stephen Cooper, and invited him to join in a scheme to obtain Oxycodone pills for resale. Brinkley told Cooper he had a personal relationship with Dr. Esham, who would write Oxycodone prescriptions, no questions asked. According to Brinkley, he obtained prescriptions from Dr. Esham "four times a month" and "guarantee[d]" he could keep Cooper "supplied up" with Oxycodone. JA590; JA737. Brinkley told Cooper "I'm going to take you [to Dr. Esham's office]. He's going to know your name. He's going to ask your name, and he's going to give us a script." JA721. When Cooper arrived, he did not fill out any paperwork or provide Dr. Esham with health insurance information. Dr. Esham asked Cooper if he had tingling in his feet, took Cooper's blood pressure, and listened to his heart with a stethoscope. But Dr. Esham did not ask Cooper if he experienced any pain.

3

Dr. Esham then provided Cooper a prescription for 90 Oxycodone pills at 30-mg. In return, Brinkley gave Dr. Esham cash.

Following this meeting, the DEA conducted a five-month long investigation into Dr. Esham's activities. As part of this investigation, the DEA engaged in a series of controlled purchases with cooperators Cooper and Miller. In December 2015, Brinkley arranged for a visit between Dr. Esham and Miller. Miller surreptitiously recorded this meeting. At this two-hour visit, Dr. Esham reviewed Miller's medical history and discussed several prescriptions he was writing for her. Miller then asked Dr. Esham for a prescription for "30 milligrams," without specifying which drug she wanted. Dr. Esham asked, "what's your injury," but when Miller pointed to her neck, he responded "lower back [pain]." JA628. Miller agreed and Dr. Esham wrote her three Oxycodone prescriptions.

The DEA arrested Brinkley, Sweet, and Ingram in February 2016. After these arrests, Cooper visited Dr. Esham, while surreptitiously recording the meeting, and informed him Brinkley had been arrested. Dr. Esham asked, "did it have to do with the drugs?" SA05. He further told Cooper "I gotta make sure he's not getting me in trouble." *Id.*

Dr. Esham then began asking Cooper questions about his medical history and Cooper protested they did not need to conduct an examination. Dr. Esham responded "[t]his is what keeps the doctor out of trouble." SA13. Cooper also told Dr. Esham he would pick up where Brinkley left off until Brinkley was released from jail. At the end of the visit, Dr. Esham wrote three prescriptions for Cooper, Sweet, and Miller in

4

exchange for $2,500 cash. Cooper told Dr. Esham "$2,500 is good money to keep this business going," to which Dr. Esham responded, "Well, I don't know about business, but you're taking care of me." SA18.

Two days after Cooper's visit, two DEA agents visited Dr. Esham's office to ask about Brinkley. Despite knowing Brinkley had been arrested, Dr. Esham feigned ignorance. He also told the DEA agents he did not remember giving Cooper any other Oxycodone prescriptions during his visit. Dr. Esham was arrested and indicted in 2017 on one charge of conspiracy to distribute Oxycodone and seventy-six charges of distribution of Oxycodone.

At Dr. Esham's trial, Sweet, Ingram, Cooper, and Miller each testified for the prosecution.[2] The jury also heard the two audio recordings of the meetings Dr. Esham had with Cooper and Miller. Both sides introduced expert witnesses. Dr. Stephen Thomas, the Government's expert in pain medicine, concluded Dr. Esham should have known Brinkley was either abusing Oxycodone or diverting the pills. He testified that a 30-mg dose of Oxycodone is "rarely useful in the treatment of chronic non-cancer pain" and is never, in his thirty years of experience, "the first dose that you give to anyone ever." JA847. Dr. Thomas concluded that many of the Oxycodone prescriptions Dr. Esham wrote for the pseudo-patients were outside the course of usual professional practice and without a legitimate medical purpose.

---

[2] Brinkley, Sweet, and Ingram each pleaded guilty to charges arising from this conspiracy in 2016. Brinkley passed away after his conviction and sentence, but prior to Dr. Esham's trial. Brinkley's statements were admitted as statements of a co-conspirator under Fed. R. Evid. 801(d)(2)(E).

With regard to Brinkley, specifically, Dr. Thomas noted Dr. Esham had a longer relationship with Brinkley than he had with the other pseudo-patients. Moreover, Dr. Esham had more extensive records on Brinkley, and during the first six months of Brinkley's visits Dr. Thomas stated there was a "documentation of history, physical examination, some injury [to Brinkley], and some medical thought process associated with" the prescriptions Dr. Esham prescribed. JA932. Accordingly, Dr. Thomas believed the Oxycodone prescriptions Dr. Esham wrote for Brinkley during this particular time-period were within the guardrails of legitimate medical practice.

But Dr. Thomas testified that in December 2012, after Dr. Esham learned Brinkley was "double dipping" or "doctor shopping," JA933, and after Dr. Esham reviewed Brinkley's x-rays, which revealed no structural damage, Dr. Esham's continuing to provide Brinkley with Oxycodone prescriptions fell "outside the course of usual medical practice and [was] not for legitimate medical purpose." JA994. In reaching this conclusion, Dr. Thomas also relied on Brinkley's referral of Sweet, who received the same treatment and dosage as Brinkley, and the fact that Brinkley told Dr. Esham three times that his Oxycodone was stolen.

Dr. Esham's treating psychiatrist, Dr. Christina Herring, testified at trial as an expert for the defense. In her report, Dr. Herring reached the opposite conclusion of Dr. Thomas and found the prescriptions were within the ordinary course of professional practice. But Dr. Herring admitted she had not yet reviewed Dr. Esham's medical records when she wrote her report.

6

The jury found Dr. Esham guilty of one count of Conspiracy to Distribute Oxycodone in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and 21 U.S.C. § 846, and thirty-eight counts of Distribution of Oxycodone in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).

At the sentencing hearing, Dr. Esham's Sentencing Guidelines imprisonment range was 97–121 months. Dr. Esham requested a downward departure under to U.S.S.G. § ███████████████████████████████. In the alternative, Dr. Esham sought a downward variance under the 18 U.S.C. § 3553(a) factors due to his good character, ████████████████████, and his lack of knowledge of his patients' selling of Oxycodone pills he prescribed.

The District Court found that the first prong of a § ████3 downward departure motion—whether Dr. Esham ████████████████████████████████ ████████████████████████—was "clearly not applicable here." JA 1530–31. And the trial judge also rejected Dr. Esham's argument that he should be granted a downward departure because his ████████████████████████████████ ████████████████. Finally, the trial judge noted that "even if [Dr. Esham] did qualify [for a downward departure], [he] would certainly not grant the downward departure and the exercise of [his] discretion based on this particular policy statement." *Id.* at 1531.

With respect to the downward variance motion, the District Court carefully considered the § 3553(a) factors and found the Guidelines range was proper. Although the trial judge noted Dr. Esham's ████████ may have played a role in his conduct, he also found Dr. Esham "knew what [Brinkley] was after, and . . . provided it," and that Dr.

7

Esham's role was even more critical than Brinkley's because there could not have been an unlawful operation without him. JA 1582. The trial judge acknowledged "Brinkley to be in the ballpark of people who [he] should be thinking about when [] sentencing [Dr. Esham]." JA 18. But he also considered Dr. Esham's special skills as a doctor, as well as the fact that Brinkley acknowledged his wrongdoings and pleaded guilty. The trial judge ultimately provided Dr. Esham with a downward variance but sentenced him to "a very significant period of incarceration" (70 months' imprisonment, followed by three years of supervised release) because of the seriousness of the offense. *Id.*

## II.[3]

We exercise plenary review over a challenge for sufficiency of the evidence. *United States v. Bruce*, 405 F.3d 145, 149 (3d Cir. 2005). But we apply a "highly deferential" standard, *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013), and reverse a jury verdict for insufficient evidence only "when the record contains no evidence, regardless of how it is weighted, from which the jury could find guilt beyond a reasonable doubt." *Bruce*, 405 F.3d at 149 (quoting *United States v. Anderson*, 108 F.3d 478, 481 (3d Cir. 1997)). Said otherwise, we view the evidence in the light most favorable to the prosecution and ask whether "any rational trier of fact could have found proof of guilt[] beyond a reasonable doubt." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) (quoting *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002)). In reviewing a jury verdict for sufficiency of the evidence, we are careful "not to

---

[3] The District Court had subject matter jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C § 1291.

8

usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [our] judgment for that of the jury." *Id.*

We evaluate the reasonableness of a sentence imposed by a District Court for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007).

## III.

Dr. Esham challenges: (1) the sufficiency of the evidence for his convictions for Distribution of Oxycodone to Brinkley; (2) the sufficiency of the evidence for his conviction for Conspiracy to Distribute Oxycodone; and (3) his sentence.

## A.

21 U.S.C. § 841(a)(1) prohibits any person from knowingly or intentionally distributing or dispensing a controlled substance, including Oxycodone. "An exception to this blanket prohibition permits physicians . . . to distribute controlled substances pursuant to a prescription." *United States v. Bansal*, 663 F.3d 634, 656 (3d Cir. 2011). But the prescription "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." *Id.* (quoting 21 C.F.R. § 1306.04(a)). If the practitioner knowingly issues prescriptions outside the usual course of his professional practice and without a legitimate purpose, he violates the statute. Accordingly, to convict Dr. Esham for distributing Oxycodone to Brinkley, "the Government must prove beyond a reasonable doubt that [Dr. Esham] knew that he . . .

was acting in an unauthorized manner." *Ruan v. United States*, 597 U. S. ____, 142 S. Ct. 2370, 2375 (2022).[4]

Dr. Esham contends the record at trial lacked sufficient evidence to convict him for distributing Oxycodone to Brinkley, given the length of time Brinkley was his patient, Brinkley's history of pain, and Brinkley's extensive medical records.[5]  But the Government's expert, Dr. Thomas, responded to each of those points in his testimony and acknowledged the differences between Brinkley and the other pseudo-patients.  In fact, Dr. Thomas opined that the Oxycodone prescriptions Dr. Esham wrote for Brinkley before December 2012 were within the guardrails of legitimate medical practice.

But Dr. Thomas concluded the prescriptions Dr. Esham wrote for Brinkley after December 2012 fell "outside the course of usual medical practice and not for legitimate medical purpose."  JA994.  In reaching this conclusion, Dr. Thomas considered Dr. Esham's knowledge that Brinkley was "doctor shopping," that Brinkley's x-rays revealed no structural damage, Brinkley's referral of the pseudo-patients, who received the same treatment and dosage as Brinkley, and the fact that Brinkley told Dr. Esham three times his pills were stolen.

---

[4] The trial judge instructed the jury that the Government needed "to prove beyond a reasonable doubt that Dr. Esham knew that what he distributed was a controlled substance and that the distribution was outside the usual course of professional practice and not for a legitimate medical purpose."  He further provided Dr. Esham with a good faith instruction.  *See* JA 1398 ("If you find that Dr. Esham acted in good faith, that would be a complete defense to these charges because good faith on the part of Dr. Esham would be inconsistent with his acting knowingly or intentionally.").

[5] These reasons likely contributed to the jury finding Dr. Esham not guilty on some of the distribution charges relating to Brinkley.

Reasonable jurors could have credited this testimony to find Dr. Esham knowingly or intentionally issued the prescriptions outside the course of his professional practice and without a legitimate purpose. Although Dr. Esham argues some of these factors are "not necessarily a red flag," Appellant's Br. 31, he must do more to overcome his high burden. And even though Dr. Esham's expert witness disagreed with Dr. Thomas's opinions, we should not "usurp the role of the jury by weighing credibility" here. *Brodie*, 403 F.3d at 133. Accordingly, we find the Government provided sufficient evidence to support Dr. Esham's convictions for distribution of Oxycodone to Brinkley.

B.

To prove the existence of a drug conspiracy, the Government must establish: (1) a unity of purpose between the alleged conspirators; (2) an intent to achieve a common goal; and (3) an agreement to work together toward that goal. *United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir. 1999). Because conspiracies "are ordinarily formed by tacit agreement," *United States v. Rawlins*, 606 F.3d 73, 80 (3d Cir. 2010), the Government may prove a conspiracy "entirely by circumstantial evidence" and "need not prove that each defendant knew all of the conspiracy's details, goals, or other participants." *Gibbs*, 190 F.3d at 197.

But the Government must prove more than just a "buyer-seller" relationship, instead proving the defendant was actually a member of the conspiracy. *United States v. Bailey*, 840 F.3d 99, 108 (3d Cir. 2016). Factors indicating a defendant participated in a conspiracy include: "(1) the length of affiliation between the defendant and the conspiracy; (2) whether there is an established method of payment; (3) the extent to

11

which transactions are standardized; (4) whether there is a demonstrated level of mutual trust; (5) whether transactions involved large amounts of drugs; and (6) whether the defendant purchased his drugs on credit." *Id.* (cleaned up) (quoting *Gibbs*, 190 F.3d at 199). Although these factors do not necessarily establish membership in a conspiracy, "their presence suggests that a defendant has full knowledge of, if not a stake in, a conspiracy." *Gibbs*, 190 F.3d at 199.

Despite Dr. Esham's contention that the evidence only established a buyer-seller relationship between himself and Brinkley, the Government offered sufficient evidence for a reasonable juror to find Dr. Esham was a member of the conspiracy to distribute Oxycodone. The evidence demonstrates Dr. Esham and Brinkley had a lengthy, multi-year relationship that involved writing multiple Oxycodone prescriptions for at least four pseudo-patients. Brinkley described his relationship with Dr. Esham as a "hook-up" that could "guarantee" a supply of Oxycodone; the co-conspirators testified to the existence of private conversations between Dr. Esham and Brinkley; and Dr. Esham treated each of Brinkley's pseudo-patients in the same manner: visiting with them after hours, failing to provide them with medical charts, and prescribing them each the same high dosage of Oxycodone, even if they did not express back pain.

Dr. Esham's February 2016 conversation with Cooper serves as further proof of this conspiracy: Dr. Esham questioned whether Brinkley was arrested because of the drugs and asked whether Brinkley would get him in trouble; accepted $2,500 to "keep this business going;" wrote Oxycodone prescriptions for Cooper, Sweet, and Miller

without being asked; told Cooper his medical exam was to "keep[] the doctor out of trouble;" and later feigned ignorance as to Brinkley's arrest when the DEA visited.

These facts could allow a juror to find Dr. Esham and Brinkley had a "common understanding" and "put their heads together" to plan and conceal their activities as part of the conspiracy. *See Gibbs*, 190 F.3d at 197, 199. And the evidence demonstrates a level of trust between Dr. Esham and the pseudo-patients, which is "indicative of membership in a conspiracy," as opposed to a mere buyer-seller relationship. *Bailey*, 840 F.3d at 111. A juror could reasonably convict Dr. Esham of conspiracy on the weight of all this evidence.

We are not persuaded by Dr. Esham's contention that the Government had to prove he knew Brinkley was selling the Oxycodone pills Dr. Esham prescribed. Even if Dr. Esham did not know Brinkley was selling drugs to others, the Government need only prove he "agreed with his patients to provide [] prescriptions without legitimate medical reasons for doing so." *United States v. McIver*, 470 F.3d 550, 563 (4th Cir. 2006). Because the evidence against Dr. Esham supports the conclusion that he conspired to provide Oxycodone prescriptions without legitimate medical reasons for doing so, the Government has met its burden of proof to support Dr. Esham's conspiracy conviction.

C.

We review a sentence imposed by the District Court for procedural and substantive reasonableness. *United States v. Tomko*, 562 F.3d 558, 567 (3d Cir. 2009) (en banc). District Courts must follow a three-step sentencing process: *first,* calculate the applicable Guidelines range; *second*, rule on any motions for departure; and *third,*

13

consider the § 3553(a) factors to determine the proper sentence. *United States v. Levinson*, 543 F.3d 190, 194–95 (3d Cir. 2008); *United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006).

If the District Court follows these procedures, we conduct an inquiry into whether the sentence is substantively reasonable. *Levinson*, 543 F.3d at 195. In making this inquiry, we ask "whether the record as a whole reflects rational and meaningful consideration of the factors enumerated in 18 U.S.C. § 3553(a)." *United States v. Grier*, 475 F.3d 556, 574 (3d Cir. 2007) (en banc).

The trial judge here properly calculated Dr. Esham's sentence under the Sentencing Guidelines and arrived at a Guideline range of 97 to 121 months. He then heard argument from both parties and denied Dr. Esham's motion for a downward departure. Finally, the trial judge granted Dr. Esham a downward variance and sentenced him to 70 months' imprisonment. Dr. Esham contends the District Court erred in denying his motion for a downward departure and in refusing to grant a larger variance.[6]

The District Court did not abuse its discretion in denying Dr. Esham's departure motion. A downward departure may be warranted if: █████████████████████████

---

[6] Dr. Esham further argues the trial judge erred in failing to consider sentencing disparities. He is factually incorrect. The trial judge specifically considered Brinkley's sentence of 48 months' imprisonment but concluded Dr. Esham deserved a harsher sentence because he was more critical to the operation, he had special skills as a doctor, and Brinkley acknowledged his wrongdoings and pleaded guilty. These factors are legitimate considerations the trial judge could consider in imposing a longer term of incarceration for him. *See United States v. Parker*, 462 F.3d 273, 278 (3d Cir. 2006) ("A sentencing difference is not a forbidden disparity if it is justified by legitimate considerations, such as rewards for cooperation." (cleaned up)).



U.S.S.G. § ███████. Application Note 1 defines ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ Dr. Esham contends he met the criteria for a downward departure based on ████████████. But even though the trial judge considered Dr. Esham's ██████████████████████████████████, he was still unpersuaded, after considering Dr. Esham's testimony and ██████████████████, by the argument that ██████████████████████████████████████ ████████.

Nor did the District Court abuse its discretion in not granting Dr. Esham a larger downward variance.[7] He believes a lesser sentence would have been more appropriate given his personal characteristics, lack of criminal history, work history as an internal medicine physician, failing physical health due to a serious cardiac problem, and ████████████████████████████████████████ ████████████████. But "a district court's failure to give mitigating factors the weight a defendant contends they deserve" does not "render[] the sentence unreasonable." *United States v. Bungar*, 478 F.3d 540, 546 (3d Cir. 2007). The trial judge carefully considered

---

[7] Notably, the trial judge provided a downward departure from 97–121 months' imprisonment to 70 months' imprisonment. But Dr. Esham requested only time served (approximately 10 months) followed by a period of house arrest and supervised release.

the § 3553(a) factors. Although the trial judge noted ████████████ may have played a role in his conduct, he also found Dr. Esham "knew what [Brinkley] was after, and . . . provided it." JA 1582. And the trial judge properly focused on the seriousness of the offense in sentencing him to "a very significant period of incarceration," one that was still below the Guidelines range. JA 1584. We do not find the District Court abused its discretion where it properly considered the sentencing factors, imposed a sentence within the advisory Guidelines, and provided the defendant with a downward variance.

IV.

For the foregoing reasons, we will affirm the judgment of convictions and sentence.